HUGHES, J.*
|, We granted certiorari in this case to review the effect to be given the dismissal of an insured, in the presence of the jury, during trial on the merits of a personal injury action. For the reasons assigned, we reverse the appellate court and remand for consideration of the remaining assignments of error raised on appeal.
FACTS AND PROCEDURAL HISTORY
In November of 2007, Mary Phyllis Soi-leau (“Plaintiff’) was injured in the course and scope of her employment with the Town of Mamou, when a front-end loader detached from a John Deere tractor and struck her in the leg. In the ensuing personal injury action, Plaintiff named as defendants: Deere and Company, the Town of Mamou, Smith’s Hardware (where the Town of Mamou rented the John Deere tractor and front-end loader for the *774 use of its employees), Harry Smith, Jr., Claire Smith, (“the Smiths”),[1] and Hartford Insurance Company (“Hartford”).
|2In May of 2009, Plaintiff entered into a “high/low” settlement agreement with Hartford and the Smiths, for which $840,000.00 would be paid to, or on behalf of, the Plaintiff “up front” (an amount she would keep even if the trier of fact later found her to be entitled to a lesser amount), in exchange for Hartford’s and the Smiths’ liability being capped at $2,500,000.00 (which would be the maximum amount these defendants would pay, after receiving a credit for the $840,000.00 paid at the time of settlement, even if the trier of fact later found Plaintiff to be entitled to a greater amount of damages).
A five-day jury trial was conducted in October of 2010. The trial began with the Smiths and Hartford as the only remaining defendants in the suit. However, on the third day of trial, Plaintiffs counsel verbally moved to dismiss “personally ... Mr. Smith ... Mrs. Smith and their company” from the suit, in the presence of the jury, further stating that Plaintiff did not'“seek any damages personally against them.” The trial court asked whether there was any objection, and counsel for Hartford and the Smiths responded, “No Your Hon- or.” No written judgment of dismissal was signed at that time.[2]
On the fourth day of trial, Hartford moved for a directed verdict, based on policy language that obligated it to pay only “those sums that the insured becomes legally obligated to pay as damages.” Hartford also filed a peremptory exception pleading the objection of no right of action, based on the Direct Action Statute, LSA-R.S. 22:1269, asserting that the dismissal of its insureds, the Smiths, also terminated Plaintiff’s action against it, as their insurer. Both motions were denied.
13After deliberations, the jury returned a verdict in favor of Plaintiff, in the total amount of $9,429,758.81 ($458,758.81 for past medical expenses, $750,000.00 for future medical expenses, $120,000.00 for past lost wages, $601,000.00 for future last wages, $1,000,000.00 for emotional and mental anguish, $4,500,000.00 for physical pain and suffering, $1,000,000.00 for loss of enjoyment of life, and $1,000,000.00 for scarring and disfigurement). The jury further assigned fault to the parties who contributed to the accident, as follows: Deere and Company, 70%; the Smiths,[3] 15%; and the Town of Mamou, 15%. After applying a credit for the $340,000.00 previously paid to Plaintiff in connection *775 with the pre-trial settlement agreement, judgment was rendered in favor of Plaintiff, against Hartford, in the amount of $1,074,468.82, along with judicial interest from the date of judicial demand, until paid, and one-half of Plaintiffs court costs. Hartford’s subsequent motions for judgment notwithstanding the verdict and/or for new trial were denied by the trial court. Hartford then filed an appeal.
Concluding the trial court legally erred in denying Hartford’s exception of no right of action, the appellate court reversed, granted the exception, and dismissed Hartford. In so holding, the appellate court found that, in executing the high/low settlement agreement, Hartford had no intent to allow Plaintiff to proceed against it alone or otherwise waive it rights, under the Direct Action Statute, but rather Hartford intended only to cap its liability at $2,500,000.00, regardless of the jury verdict. Thus, the appellate court reasoned that Plaintiff’s subsequent dismissal of Hartford’s insureds extinguished her right of action against Hartford, based on the policy language and the Direct Action Statute. Having so ruled, the appellate court concluded that all remaining issues assigned as error on appeal |4were rendered moot.[4] See Soileau v. Smith True Value and Rental, 2011-1594 (La.App. 3 Cir. 6/20/12), 95 So.3d 1214,1219-21.
This court granted Plaintiffs application for a writ of certiorari and/or review. See Soileau v. Smith True Value and Rental, 2012-1711 (La.l 1/21/12), 102 So.3d 48.
LAW AND ANALYSIS

The Direct Action Statute

The Direct Action Statute grants a procedural right of action against an insurer where the plaintiff has a substantive cause of action against the insured. The Direct Action Statute was enacted to give special rights to tort victims. In the absence of the Direct Action Statute, a plaintiff would have no right of action against an alleged tortfeasor’s liability insurer because the obligation between the plaintiff and the alleged tortfeasor is delictual in nature, and the plaintiff has no contractual relationship with the tortfeasor’s insurer. Because the Direct Action Statute provides the sole procedural right of action *776 against the insurer in this case, the Direct Action Statute provides the rules regulating the subject. Green v. Auto Club Group Insurance Company, 2008-2868 (La.10/28/09), 24 So.3d 182, 184 |,(citing Hood v. Cotter, 2008-0215 (La.12/2/08), 5 So.3d 819, 829; Cacamo v. Liberty Mutual Fire Insurance Company, 99-3479 (La.6/30/00), 764 So.2d 41, 43; and Descant v. Administrators of Tulane Educational Fund, 93-3098 (La.7/5/94), 639 So.2d 246, 249).
In this case, Hartford essentially argues that the Direct Action Statute requires that a suit brought against both an insurer and its insured must be continued against both the insurer and the insured throughout the existence of the lawsuit. Hartford asserts that when its insureds were dismissed, continuance of the suit against it alone, when none of LSA-R.S. 22:1269(B)(l)(a)-(f)’s six enumerated circumstances existed, violated the Direct'Action Statute. Thus, Hartford contends Plaintiff had no right of action to continue the suit against it alone.
At the time the Smiths were verbally dismissed from this suit, on October 13, 2010, the Direct Action Statute, LSA-R.S. 22:1269, provided:
A. No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy, and any judgment which may be rendered against the insured for which the insurer is liable which shall have become executory, shall be deemed prima facie evidence of the insolvency of the insured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person, or his or her survivors, mentioned in Civil Code Art. 2315.1, or heirs against the insurer.
B. (1) The injured person or his or her survivors or heirs mentioned in Subsection A, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and, such action may be brought against the insurer alone, or against both the insured and insurer jointly and in soli-do, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Code of Civil Procedure Art. 42 only. However, such action may be brought against the insurer alone only when:
a) The insured has been adjudged a bankrupt by a court of competent jurisdiction or when proceedings to adjudge an insured a bankrupt have been commenced before a court of competent jurisdiction;
(b) The insured is insolvent;
|fi(c) Service of citation or other process cannot be made on the insured;
(d) When the cause of action is for damages as a result of an offense or quasi-offense between children and their parents or between married persons;
(e) When the insurer is an uninsured motorist carrier; or
(f) The insured is deceased.
(2) This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana. Nothing contained in this Section shall be construed to affect the provisions of the policy or *777 contract if such provisions are not in violation of the laws of this state.
C. It is the intent of this Section that any action brought under the provisions of this Section shall be subject to all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this state.
D. It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons and their survivors or heirs to whom the insured is liable; and, that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tortfeasor within the terms and limits of said policy.
[Emphasis added.]
We first examine the wording of Paragraph (B)(1) of the Direct Action Statute, which provides a plaintiff with the alternatives of an action “brought” against the insurer alone or against both the insured and insurer jointly and in solido. A direct action may be “brought” against the insurer alone only when one of the six enumerated circumstances, listed in LSA-R.S. 22:1269(B)(l)(a)-(f), is present. Central to the issues before this court is the meaning the legislature attributed to the word “brought,” particularly as used in Paragraph (B)(l)’s phrase “such action may be brought against the insurer alone only when.... ” For if, as Hartford suggests, “brought” should be broadly read to mean filed, maintained, and continued, then an insured could never be dismissed during the course of a lawsuit, |7unless one of Paragraph (B)(1)(a) — (f)’s six enumerated circumstances is present. In contrast, Plaintiff contends that “brought” means when the suit is first instituted, so that, when a plaintiff brings an action against both the insured and the insurer, the insured may thereafter be dismissed without running afoul of the language of Paragraph (B)(1).
Because this matter involves the interpretation of a statute, it is a question of law, and is thus reviewed by this court under a de novo standard of review. This court is the ultimate arbiter of the meaning of the laws of this state. Red Stick Studio Development, L.L.C. v. State ex rel. Department of Economic Development, 2010-0193 (La. 1/19/11), 56 So.3d 181, 187.
The starting point in the interpretation of any statute is the language of the statute itself. M.J. Farms, Ltd. v. Exxon Mobil Corporation, 2007-2371 (La.7/1/08), 998 So.2d 16, 27. As stated in LSA-C.C. art. 9, when a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. LSA-C.C. art. 10. The words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter. LSA-C.C. art. 11. When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole. LSA-C.C. art. 12. Laws on the same subject matter must be interpreted in reference to each other. LSA-C.C. art. 13.
*778 The rules of statutory construction are designed to ascertain and enforce the intent of the legislature. Legislation is the solemn expression of legislative will and; thus, the interpretation of legislation is primarily the search for the legislative 18intent. We have often noted that the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons that prompted the legislature to enact the law. M.J. Farms, Ltd. v: Exxon Mobil Corporation, 998 So.2d at 26-27. It is presumed that the legislature enacts each statute with deliberation and with full knowledge of all existing laws on the same subject. Thus, legislative language will be interpreted on the assumption that the legislature was aware of existing statutes, rules of construction, and judicial decisions interpreting those statutes. Fontenot v. Reddell Vidrine Water District, 2002-0439 (La.1/14/03), 836 So.2d 14, 24. See also M.J. Farms, Ltd. v. Exxon Mobil Corporation, 998 So.2d at 27; and New Orleans Rosenbush Claims Service, Inc. v. City of New Orleans, 94-2223 (La.4/10/95), 653 So.2d 538, 544.
With respect to the wording of Paragraph (B)(1) of the Direct Action Statute, there is no ambiguity in the use of the word “brought” when the word is given its generally prevailing meaning. In the Direct Action Statute, the use of “brought,” in reference to where or under what circumstances a direct action may be “brought,” is similar to the usage of the word “brought” in LSA-C.C.P. arts. 6, 10, 41, 42, 71-74.2, 74.4-87, 121, 422, 423, 427, 462, 463, 532, 593, 593.1, 596, 614, 615, 681, 732, 733, 891, 921, 932, 1113, 1429, 1432, 1450, 2002, 2004, 2006, 2542, 2633, 2671-73, 2701, 2811, 2812, 2931, 3172, 3249, 3545, 3651, 3652, 3655, 3656, 3667, 3822, 3941, 4034, 4273, 4432, 4556, 4603, 4653, 4661, 4851, 4916, 5121, 5123, 5153, 5251, and in hundreds of other codal articles and statutes, which address when, where, against whom, and under what circumstances particular types of actions may be “brought.”
In discussing the meaning to be attributed to the phrase “where it might have been brought,” found in LSA-C.C.P. art. 123(A), although the appellate court was concerned with venue, it equated “brought” with “initially filed.” See Wallace v. \ ¡Wallace, 25,366 (La.App. 2 Cir. 1/19/94), 631 So.2d 40, 41-42, writ denied, 94-0627 (La.5/13/94), 637 So.2d 1066. The United States Supreme Court has also recognized that a suit is “brought” when, in law, it is “commenced,” stating, “[W]e see no significance in the fact that in the legislation ... the word ‘commenced’ is sometimes used, and at other times the word ‘brought.’ In this connection the two words evidently mean the same thing, and are used interchangeably.” See Golden-berg v. Murphy, 108 U.S. 162, 163-64, 2 S.Ct. 388, 389, 27 L.Ed. 686 (1883). Further, in defining what it means to “[bjring suit,” Black’s Law Dictionary states: “To ‘bring’ an action or suit has a settled customary meaning at law, and refers to the initiation of legal proceedings in a suit.... A suit is ‘brought’ at the time it is commenced....” Black’s Law Dictionary 174 (5th ed.1979).
 Accordingly, we conclude that, in the Direct Action Statute, the legislature used the word “brought” as in “initially filed” or “commenced” and, in enumerating the six circumstances applicable to a direct action against an insurer alone, the legislature was clearly speaking only to a direct action commenced against the insurer alone. Therefore, we conclude that, when an action is “brought” (i.e., commenced) against both the insured and the insurer, the six circumstances enumerated in LSA-R.S. 22:1269(B)(l)(a)-(f) are not implicated, regardless of whether the insured tort- *779 feasor is thereafter dismissed. One of the six circumstances enumerated in LSA-R.S. 22:1269(B)(l)(a)-(f) must be present only when a direct action is commenced against an insurer alone.[5] If the legislature had Unintended LSA-R.S. 22:1269(B)(l)(a)-(f) to be applicable to actions brought against both an insurer and its insured when the insured is thereafter dismissed, it could have made an express statement in the statute to that effect. See Borel v. Young, 2007-0419 (La.11/27/07), 989 So.2d 42, 62-63 (on rehearing). We conclude that the failure of the legislature to specifically make such a statement in the Direct Action Statute evidenced an intent on the part of the legislature not to restrict an action against both the insurer and its insured in such a manner.
We further reject Hartford’s argument that such a construction, as we apply to the Direct Action Statute herein, would defeat the purpose of the 1988 legislation (adding the pertinent language of LSA-R.S. 22:1269(B)(1)), which Hartford asserts was to prohibit the tactic of pitting a tort victim against a faceless insurance company. During a June 13,1988 meeting of the Louisiana Legislature’s Civil Law and Procedure Committee, Alston Johnson addressed the committee in support of the bill that would be enacted as 1988 La. Acts, No. 934, and, as quoted by Hartford, Mr. Johnson stated that “the purpose of the bill is to permit the trier of fact to see that there are two human beings involved, a plaintiff and an insured defendant, rather than just a victim and a company.” However, Mr. Johnson further explained the effect of the proposed bill, as reflected in the committee minutes, as follows:
Mr. Johnson stated that this bill will not take away from anyone the right to sue an insurance company directly. Mr. Johnson stated that in most instances if you want to sue the insurance company directly you must name the insured along with the insurance company. Mr. Johnson said that you must name the real tortfeasor in the lawsuit. Mr. Johnson said there are ... instances ... in the bill where it is not necessary to include the insured’s name....
... Mr. Johnson said that this bill just provides that you must include the tort-feasor’s name when you file a lawsuit. [Emphasis added.]

lnPolicy Language Defense

Another issue raised by Hartford in this case, in support of its exception of no right of action, is that its policies of insurance obligate it only to “pay those sums that the insured becomes legally obligated to pay as damages.” Therefore, Hartford contends that when its insureds (the Smiths) were dismissed, the cause of action against the Smiths was extinguished and they *780 could no longer be liable for Plaintiffs damage, thus mandating the dismissal of Hartford as well.
The Direct Action Statute does not create an independent cause of action against the insurer, it merely grants a procedural right of action against the insurer where the plaintiff has a substantive cause of action against the insured. Descant v. Administrators of Tulane Educational Fund, 639 So.2d at 249. The Direct Action Statute affords a victim the right to sue the insurer directly when the liability policy covers a certain risk. The statute does not, however, extend the protection of the liability policy to risks that were not covered by the policy or were excluded thereby (at least in the absence of some mandatory coverage provisions in other statutes). Anderson v. Ichinose, 98-2157 (La.9/8/99), 760 So.2d 302, 307. The unambiguous terms of the policy in the present case limit coverage only to “those sums” that the Smiths become “legally obligated to pay as damages.” Because Hartford contends that the substantive cause of action against the Smiths was extinguished by their dismissal, Plaintiffs right of action against it was also lost.
As pointed out by this court in Rollins v. Richardson, 2002-0556 (La.12/4/02), 833 So.2d 921, 924-25, the intent of the parties to a settlement or compromise between a plaintiff and an insured tortfeasor must be examined to determine whether the tort-feasor’s delictual obligation, to which the insurance coverage applies, was released. Therefore, we next examine the parties’ intent, in this case, in the execution of the written settlement agreement, in entering into al12verbal stipulation during trial, and in the statements made at the time of the dismissal of the insured tortfeasors during trial.
A compromise instrument is the law between the parties and must be interpreted according to the parties’ intent. It follows that the compromise instrument is governed by the same general rules of construction applicable to contracts. As stated in LSA-C.C. art.2046, when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. Article 2046 emphasizes that the process involves no further interpretation, as opposed to no interpretation at all. Ortego v. State, Department of Transportation and Development, 96-1322 (La.2/25/97), 689 So.2d 1358, 1363.
A compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express. LSA-C.C. art. 3076. Under Article 3076, a compromise must clearly express the rights that the parties intended to settle. LSA-C.C. art. 3076, 2007 Revision Comment (b). Courts are guided by the general principle that the contract must be considered as a whole and in light of attending events and circumstances. The meaning and intent of the parties to a written instrument, including a compromise, is ordinarily determined from the instrument’s four corners, and extrinsic evidence is inadmissible either to explain or to contradict the instrument’s terms. However, when a dispute arises as to the scope of a compromise agreement, extrinsic evidence can be considered to determine exactly what differences the parties intended to settle. Ortego v. State, Department of Transportation and Development, 689 So.2d at 1363-64.
The settlement and compromise agreement at issue herein provided as follows, in pertinent part:
11sThis Confidential High/Low Agreement is made and entered into ... by and among Mary Phyllis Soileau; Smith *781 True Value Hardware; Harry Smith, Jr.; Claire Smith; and Twin City Fire Insurance Company.
I. DEFINITIONS
[[Image here]]
... “Settling Defendants” shall mean Smith True Value Hardware, Harry Smith, Jr., Claire Smith, and Twin City Fire Insurance Company. Any one of the Settling Defendants may be referred to singularly as a Settling Defendant.
[[Image here]]
... “Plaintiff’ shall mean Mary Phyllis Soileau.
... “Policies” shall mean that certain policy of comprehensive general liability insurance bearing Policy No. 88 UUN SX9390 with a policy period of 8/1/07 to 8/1/08, and that certain policy of excess liability insurance bearing Policy No. 83 XHU SX9390 with a policy period of 8/1/07 to 8/1/08 issued to Claire D. Smith & Harry Smith, a Partnership dba Harry Smith Hardware by Hartford.
... “Hartford” shall mean Twin City Fire Insurance Company.
... “Smiths” shall mean Smith True Value Hardware, Harry Smith, Jr., and Claire Smith.
... “Suit” shall mean that certain lawsuit styled Mary Phyllis Soileau v. Smith’s True Value Rental d/b/a “Just Ask Rental” and Deere and Company, No. 69770, pending [before] the 13th Judicial District Court, Parish of Evangeline, State of Louisiana.
⅜ ⅛ *
II. RECITALS
WHEREAS, Plaintiff alleges that she was injured when she was hit by a loader that fell from a tractor operated by the Town of Mamou on November 1, 2007;
WHEREAS, Plaintiff filed the Suit against certain persons including the Settling Defendants in an effort to recover damages for .her alleged injuries;
WHEREAS, thé Settling Defendants deny all liability to Plaintiff;
WHEREAS, [P]laintiff denies that this in any way compensated [PJlaintiff for her entire injury or makes her whole;
* * *
114WHEREAS, Hartford issued the Policies which-subject to their terms, limitations, conditions, and exclusions-afford certain coverage to the Smiths in connection with the Suit; and
WHEREAS, to resolve certain of the disputes, the Parties heretofor enter in this Agreement.
III.UNDERTAKINGS
1. On behalf of the Smiths, Hartford shall pay ... $340,000 ... jointly to the Plaintiff ... on or before May 22, 2009....
2. Plaintiff ... shall not seek and agreefs] not to execute any portion of a judgment, inclusive of any attorney[’]s fees, legal interest, and/or costs, rendered in the Suit against the Settling Defendants collectively that is in excess of ... $2,500,000 ... irrespective of the amount that may be awarded at trial against the Settling Defendants and [P]laintiff will accept the $340,000 regardless of any amount rendered in her favor and will retain said amount even if she is not rendered any damages at trial or settlement.
3. Plaintiff ... agreefs] to renounce that portion of a judgment, inclusive of any attorney[’]s fees, legal interest, and/or costs ... rendered in the Suit against the Settling Defendants collectively that is in excess of ... $2,500,000 ... irrespective of the amount that may *782 be awarded at trial against the Settling Defendants....
4. The Parties to this Agreement understand and agree that, regardless of the verdict at trial in the Suit, the Settling Defendants shall collectively receive a credit of ... $840,000.... The Parties further agree that any judgment, including without limitation a judgment for attorney’s fees, costs, and/or legal interest ... rendered against the Settling Defendants shall be collectively reduced against them by ... $340,000_ All Parties to this Agreement expressly agree that no final judgment should be entered against the Settling Defendants that collectively is in excess of ... $2,500,000 ... against them. The terms of this paragraph apply regardless of the amount of the verdict award, if any, against the Settling Defendants....
* * *
V. NO ADMISSION OF LIABILITY
1. This Agreement represents a compromise of disputes among the Parties.
2. This Agreement shall not be construed as an admission by any Party of any liability whatsoever, and [P]laintiff does not waive her rights to be made whole.
VI. CONTINUATION OF LITIGATION/RESERVATION OF RIGHTS
|1S1. Subject to the provisions of this Agreement, including but not limited to Section III, Plaintiff ... reserve[s] all rights to proceed against all defendants in the Suit, including the defendants in this agreement.
[[Image here]]
4. Neither the existence of this Agreement nor any action taken in accordance with its terms shall be construed in any way to prejudice the interests or rights of any Party to this Agreement. All of the terms, provisions, conditions, exclusions, endorsements, and other limitations of the Policies, and all rights, causes of action, claims or benefits of the Parties that are not expressly released, waived or limited by this Agreement are preserved.
5. The Parties understand and accept each other’s reservation of rights. Except as specifically provided elsewhere in this Agreement, no waiver or estoppel shall arise as a result of this Agreement or any delay in its having been undertaken, nor shall any term, provision, condition, exclusion, endorsement, or other limitation of any insurance policy be considered waived.
[[Image here]]
XII. ARMS-LENGTH NEGOTIATION/CONSTRUCTION
1. This Agreement is the result of arms-length negotiations of the Parties after each has consulted with informed and competent counsel.
2. Each of the Parties has participated in the drafting of this Agreement.
3. The language of this Agreement shall not be presumptively construed in favor of or against any of the Parties.
XIII. HEADINGS
Paragraph headings contained herein are for purposes of organization only and shall not constitute Part of this Agreement nor be used to expand or modify the terms of this Agreement.
XV. ENTIRE AGREEMENT
1. This Agreement is an integrated agreement, containing the entire understanding among the Parties regarding the matters addressed herein and, except as set forth in this Agreement, no representations, warranties or promises *783 have been made or relied upon by the Parties to this Agreement.
2. This Agreement shall prevail over prior communications regarding the matters contained herein.
[[Image here]]
XVIII. GOVERNING LAW
This Agreement and all matters relating or pertaining thereto shall be governed by and under the laws of the State of Louisiana. However, this provision shall not be construed to apply to, and will not affect the law governing any insurance policy or coverage thereunder.
From the four corners of the parties’ settlement agreement, it is clear that Plaintiff agreed to waive any right she had to collect more than $2,500,000.00 (inclusive of the $340,000.00 paid in conjunction with the settlement) from the settling defendants (Hartford and the Smiths), even in the event that a subsequent trial resulted in an award against these defendants greater than $2,500,000.00, and, correspondingly, if a subsequent trial award against the settling defendants was for less than $340,000.00, Plaintiff would nevertheless be entitled to keep the $340,000.00 paid by the settling defendants pursuant to the settlement agreement. There was no express provision contained within the settlement agreement that the Smiths would either be released from liability or dismissed from the lawsuit. The settlement agreement merely limited the lowest and highest amounts recoverable from the settling defendants to $340,000.00 and $2,500,000.00, respectively. Even though not expressed in the settlement agreement, since the Smiths were fully covered under the Hartford policy for any amount that Plaintiff could recover against them pursuant to the settlement agreement, Plaintiffs position that she would not be collecting any judgment amount from the Smiths, on account of the terms of the settlement agreement, was a logical conclusion.
In addition to the written settlement agreement, Plaintiff points to other statements made during the trial, as being indicative of her intent to release the Smiths only personally and to reserve her rights against Hartford. On the second 117day of trial, before the jurors were present in the courtroom, the parties’ counsel stipulated on the record, as follows:
BY [PLAINTIFF'S COUNSEL]: Okay. In the matter of, Phyllis Soileau vs Smith’s True Value Hardware and Hartford Insurance Company, the plaintiff has agreed and does hereby stipulate that any excess judgment taken above and beyond uh ... the policy limits[ 6] will not be enforced against Harry Smith ... um ... Claire Smith or the partnership. The plaintiff has no intention of attempting to enforce any excess judgment beyond the policy limits written by Hartford and reserves all rights in regard to Hartford and the plaintiffs attempts to secure an excess judgment ... the payment of an excess judgment against Hartford Insurance.
BY THE COURT: Gentlemen do you agree to that stipulation?
*784 BY [DEFENSE COUNSEL]: Yes Your Honor, no objection.
[Ellipses original; emphasis added.]
This stipulation reinforces the language, contained in the May 2009 settlement agreement, stating that any verdict amount awarded above the settlement amount would not be enforced.
We further note that on the third day of trial, with no jurors in the courtroom, there was a discussion between counsel and the court, which concerned whether, and to what extent, the insurance coverage provided by Hartford to the Smiths would be revealed to the jury. Defense counsel indicated that the defense had no objection to the admissibility of the Hartford insurance policies, but stated that any mention of the policy limits before the jury was improper; the court and Plaintiffs counsel agreed with this position. During this colloquy, counsel for the defense asked whether Plaintiffs counsel was seeking a stipulation on the issue of insurance coverage, and Plaintiffs counsel responded:
[ 1sNo, I want the jury to know that [the Smiths have] insurance and I want the policies admitted. I ... I don’t care about the amounts. The jury’s entitled to know there’s insurance coverage and I’m going to dismiss ... I’m going to make a motion to dismiss certain parties in this matter and I want the jury to know it and I’m entitled to have the jury know it. They don’t agree ... there’s a lot of things they don’t agree with us on. [Ellipses original.]
Defense counsel again raised the question of whether a stipulation as to coverage should be entered; Plaintiffs counsel then stated:
No. I want to show [Mr. Smith] the policies and ask if he had those policies and if they were in effect at the time of the accident and I’m finished with it and
I-want to introduce the policies. I don’t want to show ‘em to the jury.
When the court then indicated that the line of questioning proposed by Plaintiffs counsel would be allowed, counsel for the defense objected as follows:
We also think Judge that given that we’re willing to stipulate to the admissibility of the policies [and] that there’s a prejudicial value as [far] as spending time talking about the policies in front of the jury. So for that reason sir we object to it.
The court responded that he would make sure the line of questioning was not belabored and then made the following statement to counsel for the defense:
[T]he next problem that [Plaintiffs counsel] has posed and I think maybe you ... might want to address [is] that he wants to ... make a motion to dismiss parties and he wants to do it in the hearing of the jury and there my dilemma is.
The court further stated:
[A]t the beginning of the trial when I was asking if the prospective jurors knew lawyers, parties, we mentioned the Smiths as being parties. So. if they’re not going to be parties I guess the jury has a right to know that they’re not going to be parties anymore.
Counsel for the defense responded:
[I]t seems that if there is a dismissal the jury is going to learn that whether the dismissal takes place in the jury’s presence or whether Your Honor advises the jury at another time.
The court responded:
I kind of think the same thing but I don’t want any theatrics and I don’t want anything more made of it than the fact that they’re being dismissed.
*785 119Plaintiff s counsel agreed, and no further objection was raised by counsel for the defense at that time.
Shortly thereafter, during Mr. Smith’s testimony before the jury, the following colloquy occurred:

BY [PLAINTIFF’S COUNSEL]:

Q. We all know you Mr. Smith. We don’t need to ask your name again. Uh.... at the time of this accident in November of '07 did you have an insurance policy with Hartford Insurance?
A. Yes I did.
Q. I want to show you the policy and ask if that’s the policy that you had at the time of the accident?
A. Yes.
BY [PLAINTIFF’S COUNSEL]: We offer, file and introduce that into evidence Judge.
BY [DEFENSE COUNSEL]: There’s no objection Your Honor.
BY THE COURT: Let it be admitted. BY [PLAINTIFF’S COUNSEL]: Now considering that Judge the ... Phyllis has instructed me to dismiss Mr. Smith, personally, uh ... Ms. Smith ... Mrs. Clara Smith and their company from this lawsuit. She doesn’t seek any damages personally against them and we move to dismiss ‘em.
BY THE COURT: No objection?
BY [DEFENSE COUNSEL]: No Your Honor.
BY THE COURT: So ordered.
[Ellipses original; emphasis added.]
After reviewing the settlement agreement and statements made during trial, we conclude that, although there was no express agreement between Plaintiff, Hartford, and the Smiths on the point, the totality of the circumstances indicate that there was an intent on Plaintiffs part, independent of the settlement agreement between the parties, to dismiss the Smiths, but only to the extent of their personal liability. Because the Smiths’ personal liability, as a result of the May 2009 12nsettlement agreement, did not extend to any excess damages over Hartford’s policy limits (as damages were contractually capped at an amount less than the policy limits), the only potential personal liability of the Smiths, at the time they were dismissed, would have arisen only if Hartford became insolvent and unable to pay any subsequent judgment amount. We believe the facts and circumstances of this case clearly show that Plaintiff intended to effect only a limited dismissal of the Smiths, continuing the suit for a determination of the Smiths’ legal liability, for which the Hartford policies provided 100% coverage pursuant to the policies of insurance and the limitation on recovery expressed in the May 2009 settlement agreement. Plaintiffs intention in making the verbal motion to dismiss was clear at the time of the motion, and, obviously aware of that intention, counsel for Hartford and the Smiths offered no objection.
We recognize that the Direct Action Statute expressly provides, by stating that a tort victim has a right of direct action against the insurer and that such action may be brought “against both the insured and insurer jointly and in solido,” that an insured and insurer are solidary obligors. See Descant v. Administrators of Tulane Educational Fund, 639 So.2d at 249-50. Thus, the Civil Code articles applicable to solidary obligors are appropriately considered in a suit against an insurer and its insured.
Former Louisiana Civil Code article 2203 provided that an obligee who remitted a debt in favor of one solidary obligor, without expressly reserving his right against the others, was deemed to have forfeited the entire obligation. How *786 ever, this rule was abandoned in favor of the converse: the present law provides that when partial payment is received, sol-idary liability is preserved unless it is expressly renounced. Louisiana law no longer requires a reservation of rights be included in a release to protect a settling plaintiffs right to pursue his or her claims against non-settling solidary obligors. See Dukes v. Deelouette, 2010-|004521 (La.App. 1 Cir. 6/11/10), 40 So.3d 1231, 1235, writ denied, 2010-1623 (La.10/8/10), 46 So.3d 1270 (citing Summit v. Bickham, 2003-1252 (La.App. 1 Cir. 9/8/04), 887 So.2d 73, 80-81, writ denied, 2004-2506 (La.1/7/05), 891 So.2d 696 (Parro, J., concurring)). Louisiana Civil Code article 1802 now specifically reads, “Renunciation of solidarity by the obligee in favor of one or more of his obligors must be express.” The 1984 Revision Comments to LSA-C.C. art. 1802 further state:
This Article is new. It changes the law insofar as it eliminates the presumption of renunciation or waiver of solidarity in the absence of a reservation by the obli-gee and, as a consequence, the requirement of a receipt extended in a particular manner. The rule in this Article is consistent with the principle that a party should not be presumed to have given up a right.
LSA-C.C. art. 1802, 1984 Revision Comment (a).
When the legislature enacted and amended the Direct Action Statute, it did so with knowledge of the applicable Civil Code provisions on solidarity.[7] In not excepting the application of the Civil Code provisions on solidarity, as to the solidarily liable insurer and insured, the legislature must have intended these provisions to apply to an insurer and its insured. Therefore, when, in the instant case, Plaintiff released and dismissed Hartford’s insureds (the Smiths), it was not necessary for her to expressly reserve her rights to proceed against Hartford, though the intent of Plaintiff to do so was evident from the trial court proceedings discussed here-inabove. Further, as between Hartford and the Smiths, Hartford had |22the obligation to pay to Plaintiff 100% of the Smiths’ liability for her damages.[8] In dis *787 missing the Smiths, Plaintiff only renounced her right to collect against the Smiths in the event, however unlikely, that Hartford would become insolvent or bankrupt and be unable to pay for the Smiths’ share of Plaintiffs damages, in accordance with its insurance policies. As Plaintiff did not expressly renounce her right to proceed against Hartford for the amount it was contractually obligated to pay under the policies of insurance issued to the Smiths, the limited dismissal of the Smiths did not affect the right of action accorded Plaintiff, under the Direct Action Statute, as to Hartford.
CONCLUSION
We conclude that the appellate court erred in reversing the trial court’s denial of Hartford’s exception pleading the objection of no right of action, granting judgment in Hartford’s favor, and dismissing Hartford from the suit. In so ruling, the appellate court failed to properly construe the Direct Action Statute. We hold that the six enumerated instances in LSA-R.S. 22:1269(B)(l)(a)-(f) in which an action may be commenced against an insurer alone do not apply to a suit commenced against both an insurer and its insured, even if the insured is later ^dismissed. We further conclude that the appellate court failed to give effect to Plaintiffs intent to only partially dismiss the Smiths and to continue the suit for a determination of the Smiths’ liability for damages, which Hartford was contractually obligated to pay. Furthermore, since the appellate court ruled on only three of Hartford’s six assignments of error and did not rule on Plaintiffs assignments of error, we remand this matter to the appellate court for consideration of the remaining assignments of error.
DECREE
For the reasons stated herein, we reverse the appellate court’s judgment and remand this matter to the appellate court for disposition of the parties’ remaining assignments of error.
REVERSED; REMANDED TO THE COURT OF APPEAL, THIRD CIRCUIT.
VICTORY, Justice, dissents and assigns reasons.
WEIMER, Justice, concurs and assigns reasons.
GUIDRY, Justice, dissents and assigns reasons.
CLARK, Justice, dissents for the reasons assigned by GUIDRY, J.
Judge JEFFERSON D. HUGHES III was assigned as Justice pro tempore, sitting for KIMBALL, C.J., for oral *788 argument. He not sits as an elected Justice at the time this opinion is rendered.

 Judge Jefferson D. Hughes III was assigned as Justice pro tempore, sitting for Kimball, C.J., for oral argument. He now sits as an elected Justice at the time this opinion is rendered.

. Smith's Hardware was named by Plaintiff in her petition as "Smith True Value and Rental d/b/a 'Just Ask Rental’ however, the defendant answered the suit declaring that its correct name was "Smith's Hardware.” Further, Smith’s Hardware was later revealed to be a partnership, whose partners were Harry Smith, Jr., and his mother, Claire Smith. Smith’s Hardware's insurer, Hartford Insurance Company, Harry Smith, Jr., and Claire Smith were subsequently added as party defendants by a supplemental and amending petition. For ease of discussion, we refer herein to the partnership and the partners, collectively, as "the Smiths."

. The written "Order” of dismissal was not signed by the trial judge until February or March of 2011. Hartford attempts to attribute some significance to the fact that the signed dismissal of the Smiths was "with" prejudice. However, the designation of "with” or "without” prejudice is at the discretion of the judge, pursuant to LSA-C.C.P. art. 1671. At the time the trial judge was presented with the dismissal order, as to the Smiths, the trial had been concluded some four months previously and a judgment had been rendered designating Hartford as the only judgment debtor. Therefore, the subsequent designation as to prejudice in the dismissal of the Smiths was of no consequence.

.The Smiths were listed on the jury verdict form as "Smith True Value."

. Other assignments of error, urged by Hartford, which were not addressed by the appellate court, included its contentions: (1) that the jury's assessment of Plaintiff's general damages at $7.5 million was unreasonable and abusively high in light of the record reviewed in its entirety: (2) that the jury’s assessment of Plaintiff's general damages at $7.5 million should be reversed because the award was tainted by an improper appeal to the jury’s prejudice against insurance companies, which prevented the jury from doing justice (asserting that Plaintiff's counsel dismissed Hartford’s insureds in front of the jury and then, against the Court's warning, elicited testimony from Plaintiff that she did not want to collect any money from the insureds and that money would be recovered solely from their insurance company (Hartford) and that Plaintiff’s counsel then improperly informed the jury that Plaintiff would not be able to collect money for any fault it assessed against Deere, the settling manufacturer, thereby'encouraging the jury to increase its award of damages); and (3) that the jury’s assessment of Plaintiff’s future medical expenses at $750,000.00 was speculative, not supported by medical testimony that specific care would be needed or as to what the probable cost of any such future care would be, and contrary to the testimony of the physicians that she was not expected to undergo surgery in the future and was only expected to need periodic office exams and some medication. Further, Plaintiff had also filed an appeal and assigned error to: (1) the trial court’s failure to instruct the jury concerning the burden of proving and apportioning fault under the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 etseq.; and (2) to the jury's erroneous apportionment of fault among the parties. See Soileau v. Smith True Value and Rental, 95 So.3d at 1217.

. A question was raised during oral arguments of this case about the validity of an action commenced against both an insurer and its insured, during which the insured might be quickly dismissed, as for example, the next day. We express no opinion herein as to such a case since the facts and circumstances addressed herein did not involve such a factual scenario. In this case, Plaintiff's injury occurred in November of 2007. Plaintiff initially filed suit in April of 2008 against Smith’s Hardware and several other alleged tortfeasors, and she amended her petition in August of 2008 to add as defendants Hartford and its insureds, Harry Smith, Jr. and Claire Smith. The settlement agreement between Plaintiff, Hartford, and the Smiths was entered into in May of 2009. Trial of the matter began on October 11, 2010, and Plaintiff verbally dismissed the Smiths, in open court, on October 13, 2010. Thus, the insureds in this case were active defendants in this lawsuit for over two years. It is possible that a case may arise, which is filed against both an insurer and its insured, that may not be in good faith, where the insured is quickly dismissed, but we leave for another day a ruling on such a scenario.

. Hartford points out to this court that the $2.5 million limitation on Plaintiffs recovery, agreed upon in the May of 2009 settlement agreement, did not represent Hartford’s "policy limits” as Plaintiff states in brief to this court. Instead, Hartford states that its primary policy had a $1 million coverage limit and its excess policy had a $2 million coverage limit. We note that Plaintiff does not claim that the use of "policy limits” in this stipulation changed the May 2009 settlement agreement’s upper limit of recovery from $2.5 million to the actual policy limits of $3 million; therefore, Plaintiff’s misstatement does not affect the issues before this court.

. It is well established that the legislature is presumed to enact each statute with deliberation and with full knowledge of all existing laws on the same subject. Thus, legislative language will be interpreted on the assumption that the legislature was aware of existing statutes, well-established principles of statutory construction, and with knowledge of the effect of their acts and a purpose in view. It is equally well settled under our rules of statutory construction that, where it is possible, courts have a duty in the interpretation of a statute to adopt a construction that harmonizes and reconciles it with other provisions dealing with the same subject matter. State v. Louisiana Land and Exploration Company, 2012-0884 (La. 1/30/13), 110 So.3d 1038, 1045 (citing LSA-C.C. art. 13); M.J. Farms, Ltd. v. Exxon Mobil Corporation, 2007-2371 (La.7/1/08), 998 So.2d 16, 27; City of New Orleans v. Louisiana Assessors' Retirement and Relief Fund, 2005-2548 (La. 10/1/07), 986 So.2d 1, 15; State v. Johnson, 2003-2993 (La. 10/19/04), 884 So.2d 568, 576-77; and State v. Campbell, 2003-3035 (La.7/6/04), 877 So.2d 112, 117.

. As recognized by the Louisiana Civil Law Treatise, the type of solidarity that exists by statute between the insured and the insurer toward the victim is an unusual one. In the first place, it is solidarity only within the policy limits and coverages, for beyond that the insurer is not obligated to anyone, solidar-ily or otherwise. Within the policy limits, for all practical purposes, the insurer is the only "debtor” who is liable for anything. Short of insolvency of the insurer, the insured will never become liable for an amount within the policy limits. Even though retention of rights against the insurer as a solidary obligor might be authorized by the Civil Code, the rights of the creditor would be reduced by "the part” of the debtor whom he released. But "the part” of the insured within the policy limits is nothing, for all practical purposes. Beyond *787 the policy limits, there is nothing further to collect from the retained debtor (the insurer). Thus, the victim gets the benefit of solidarity as opposed to suretyship (he can release the insured and retain the insurer), but he need not suffer any reduction in the "solidary” obligation. This is not, however, as unfair as it seems. The surety’s obligation is extinguished when the principal debtor is released because the surety's right of subrogation against the debtor for any amounts paid to the creditor is destroyed. The liability insurer, on the other hand, has no such right of subrogation against the insured, and therefore it suffers no loss when its ‘'solidary co-debt- or” is released. Thus, the true rationale is that no reduction of any of the insurer's liability is needed, because unlike other solidary debtors, its rights are not affected by the release of a "co-debtor.” When added to the law’s traditional encouragement of amicable settlements, this rationale is sufficient to override the "contingent” liability of the insurer for its insured’s conduct and the "suretyship” result that would follow from such a characterization. William Shelby McKenzie and H. Alston Johnson, III, 15 La. Civ. L. Treatise, Insurance Law & Practice § 2:8 (4th ed.).