# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 11-1594

MARY PHYLLIS SOILEAU

VERSUS

SMITH TRUE VALUE AND RENTAL, ET AL.

**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 69,770-B
HONORABLE THOMAS F. FUSELIER, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**AFFIRMED.**


W. Glenn Soileau
Jacques P. Soileau
Soileau & Soileau
P. O. Box 344
Breaux Bridge, LA 70517
(337) 332-4561
COUNSEL FOR PLAINTIFF/APPELLEE:
    Mary Phyllis Soileau

Anthony C. Dupre
Attorney at Law
P. O. Drawer F
Ville Platte, LA 70586
(337) 363-3804
COUNSEL FOR DEFENDANT/APPELLEE:
    Smith True Value and Rental

**Bradley C. Myers**
**John F. Jakuback**
**Kean, Miller, Hawthorne, D'Armond, McCowand & Jarman**
**P. O. Box 3513**
**Baton Rouge, LA 70821**
**(225) 387-0999**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Risk Management, Inc.**


**Peter F. Caviness**
**Steven J. Bienvenu**
**Dauzat, Falgoust, Caviness & Bienvenu, L.L.P.**
**P. O. Box 1450**
**Opelousas, LA 70571**
**(337) 942-5812**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Louisiana Municipal Risk Management**


**J. Michael Percy**
**Andrew P. Texada**
**Stafford, Stewart & Potter**
**P. O. Box 1711**
**Alexandria, LA 71309**
**(318) 487-4910**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Deere and Company**
    **John Deere Limited**


**Richard J. Petre, Jr.**
**Onebane Law Firm**
**P. O. Box 3507**
**Lafayette, LA 70502**
**(337) 237-2660**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Smith's Hardware**


**Charles M. Lanier, Jr.**
**Mary Beth Meyer**
**Christovich & Kearney, LLC**
**601 Poydras Street, Suite 2300**
**New Orleans, LA 70130**
**(504) 561-5700**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Hartford Insurance Company**

**Karen Day White**
**Louisiana Municipal Association**
**700 North Tenth Street, Suite 440**
**Baton Rouge, LA 70802**
**(225) 334-5001**
**COUNSEL FOR DEFENDANT/APPELLEE:**
   **Louisiana Municipal Association**

**Rodney Janis**
**Wilson Elser Moskowitz Edelmen & Dicker LLP**
**222 Lakeview Avenue, Suite 500**
**West Palm Beach, FL 33401**
**(561) 515-4010**
**COUNSEL FOR DEFENDANT/APPELLEE:**
   **Smith's Hardware**

**GREMILLION, Judge.**

The plaintiff, Mary Phyllis Soileau, and the defendant, Hartford Insurance Company, appealed a jury verdict in Soileau's favor. On remand from the Louisiana Supreme Court, we address the merits. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Soileau sustained serious injuries following a November 2007 accident in which a John Deere front-end loader detached from a John Deere tractor and fell onto her leg, shattering it. Soileau filed suit in April 2008, against Deere & Company (Deere), the Town of Mamou (Mamou), and Harry Smith Jr., Claire Smith, Smith's Hardware (collectively Smith's), and Smith's insurer, Hartford Insurance Company (Hartford). Smith's rented the Deere equipment to Mamou, for whom Soileau was working supervising the cleaning out of canals with the front-end loader at the time the accident occurred.

In May 2009, Soileau entered into a "high/low" agreement with Hartford in which Hartford's liability was capped at its policy limit of $2,500,000.00 regardless of the jury's verdict. Soileau released Smith's of any personal obligation to Soileau.

Soileau settled with Deere in August 2010, and proceeded to trial against Smith's and Hartford. A jury trial was held over five days in October 2010. On the fourth day of trial, Soileau moved in open court to dismiss the Smiths personally and their company, Smith's Hardware. That same day, Hartford moved for a directed verdict based on its policy language that obligated it to pay only those sums that the insured becomes legally obligated to pay. The trial court denied the motion. Hartford also filed a peremptory exception of no right of action, arguing that pursuant to the Louisiana Direct Action Statute, La.R.S. 22:1269,

dismissal of Smith's terminated Soileau's action against it. The trial court denied Hartford's exception.

The jury found in favor of Soileau, apportioning Smith's with 15% of the fault, Mamou with 15%, and Deere with 70%. It awarded damages totaling $9,429,758.81. The trial court entered judgment against Hartford casting it with 15% of the damages, equaling $1,400,000.00. Hartford was ordered to pay $1,074,463.82 (Hartford received a credit for sums it already paid pursuant to the high/low compromise agreement). The trial court further cast Hartford with 50% of Soileau's court costs.

Hartford filed a motion for judgment notwithstanding the verdict or, alternatively, for new trial, re-urging that once Smith's was dismissed Soileau had no claim against it under the language of its policy and under the direct action statute. Soileau also filed a motion for judgment notwithstanding the verdict regarding fault apportionment. The trial court denied Hartford's and Soileau's motions. Hartford and Soileau appealed. On appeal, we found that trial court legally erred in denying Hartford's exception of no right of action, and we dismissed Hartford rendering the remaining assignments of error moot. *Soileau v. Smith True Value and Rental*, 11-1594 (La.App. 3 Cir. 6/20/12), 95 So.3d 1214. However, the supreme court granted Soileau's application for a writ of certiorari and/or review and reversed our holding, finding that Soileau's action against Hartford was maintained despite the mid-trial dismissal of its insureds. *Soileau v. Smith True Value and Rental*, 12-1711 (La. 6/28/13), __ So.3d __. The supreme court remanded the case to us with the instruction that we address the remaining assignments of error.

2

## ISSUES

The remaining assignments of error that we will address are Hartford's contentions that:

1. The jury's award of $7.5 million in General Damages is unreasonable and abusively high in light of the record reviewed in its entirety.

2. The jury's verdict awarding $7.5 million in General Damages should be reversed because the award was tainted by an improper appeal to the jury's prejudice against insurance companies that prevented the jury from doing justice. Plaintiff's counsel dismissed Hartford's insureds in front of the jury and then, against the Court's warning, elicited testimony from plaintiff that she did not want to collect any money from the insureds and that money would be recovered solely from their insurance company, Hartford. Plaintiff's counsel then improperly informed the jury that plaintiff would not be able to collect money for any fault it assessed against Deere, the settling manufacturer, thereby encouraging the jury to increase its award of damages.

3. The jury's award of $750,000 in future medical expenses is speculative and supported neither by medical testimony of specific care that will be needed nor of the probable cost of any such future care and is contrary to the testimony of the physicians that she is *not* expected to have surgery in the future and is only expected to need periodic office exams and some medication.

Soileau assigned as error:

1. The trial court was erroneous in failing to instruct the jury concerning the burden of proving and apportioning fault under the Louisiana Product Liability Act; and/or the jury was erroneous in apportioning fault amongst the parties.

## DAMAGES

Soileau testified regarding the impact the accident has had on her life. She held many elected positions in the town of Mamou, including as Chief of Police and City Councilwoman. She worked as the supervisor of Parks and Recreation and was appointed Street Commissioner at the same time. Soileau described her involvement as a member of the staff of the Mamou Cajun Music Festival for over

3

twenty years, which involved cooking and other activities for the festival. She was a Mamou Girls Softball coach for more than twenty years and a coach for Grand Mamou Sports. Soileau said that she was at the ball field every day during the summer. She was further involved in numerous high school sporting activities. Her days were filled with vigorous physical activity as part of her job and her personal activities. Soileau described waking up to find the bucket on top of her leg. Soileau was transported by ambulance to the hospital, where she remained for sixty-five days undergoing twenty-two surgeries. Her twenty-third surgery occurred just one month prior to the trial. She testified that since the accident she has not gone a day without pain. Soileau said that she takes several pain and sleeping medications daily and experiences daily swelling in her leg.

Soileau described being homebound following surgery for a month and then going outside only when the physical therapist started coming for approximately two months. Soileau then attended outpatient physical therapy three days a week. She testified that she is in pain about 95% of the time and that she is unable to engage in any of her former activities.

Dr. Gregory M. Savoy, a board-certified surgeon for more than thirty-seven years, was qualified as an expert in the field of surgery and vascular surgery. Dr. Savoy described Soileau's condition upon entering the emergency room: "She had severe injury to the . . . right leg. She had . . . a large laceration running down the medial aspect of that leg, and with the crush injury over the thigh and over the inside of the right calf. She also had . . . multiple fractures of her foot."

Dr. Savoy treated Soileau's soft tissue injuries involving the upper and lower leg and performed twenty surgeries on her over the course of her hospital stay to remove dead tissue, treat infection, close lacerations, debride tissue, and perform skin grafts. Photographs were introduced into evidence depicting extensive

4

injuries and disfigurement to the entirety of Soileau's right leg and foot. Dr. Savoy testified that the injuries were serious and painful, resulting in permanent disability from which she will not be able to return to her prior work.

Dr. Savoy testified that Soileau would need periodic follow-up work. Although he said she was stable, he said there can be problems with skin grafts and that she had to be regrafted several times. Dr. Savoy said that Soileau's leg will be ultra-sensitive to touch and clothing; she cannot stand for very long and she cannot walk without the assistance of a crutch or a cane. Further, she will experience permanent swelling.

Dr. Savoy used skin from Soileau's left leg, leaving it scarred also. The scarring in both is permanent. Dr. Savoy said that he could not foresee Soileau sitting for more than forty-five minutes at a time nor walking more than thirty feet. Dr. Savoy has not recommended any further surgeries for soft tissue injuries, nor did he foresee the need for any future surgeries for soft tissue injuries.

Dr. Stephen Nason, an orthopedic surgeon for more than forty years, treated Soileau from her admission to the emergency room. He described Soileau's leg and ankle fractures as "crushing injuries" that would be very painful. He described placing pins in her ankle. Dr. Nason said Soileau will have a permanent limp and permanent shortening of her leg. He said that she would need to permanently use a brace on her ankle. Dr. Nason said there would always be some degree of pain. He testified that Soileau has a permanent disability that will require follow-up care for life. He prescribed anti-inflammatory medications and muscle relaxers for spasms. He said that she will never have a fully functional recovery from the injuries.

*General Damages*

Our jurisprudence has consistently held that in the assessment of damages, much discretion is left to the judge or jury, and upon appellate review such awards will be disturbed only when there has been a clear abuse of that discretion, *Coco v. Winston Industries, Inc.*, 341 So.2d 332 (La.1977). And, "[i]t is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient," *Reck v. Stevens*, 373 So.2d 498, 501 (La.1979). Appellate courts review the evidence in the light which most favorably supports the judgment to determine whether the trier of fact was clearly wrong in its conclusions. *Arceneaux v. Domingue,* 365 So.2d 1330 (La.1978). Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the jury abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate. *See Reck v. Stevens, supra*; *Cariere v. State Farm Insurance Co.*, 467 So.2d 867 (La.App. 2d Cir. 1985).

Prior awards under similar circumstances serve only as a general guide. If the appellate court determines that an abuse of discretion has been committed, it is then appropriate to resort to a review of prior awards, to determine the appropriate modification of the award. In such review, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. *See Reck v. Stevens, supra*; *Wactor v. Pickens Lumber Co.*, 505 So.2d 815 (La.App. 2d Cir.1987), *writ denied*, 508 So.2d 827 (La.1987). In instances where the appellate court is compelled to modify awards, the award will only be disturbed to the extent of lowering or raising an award to the highest or lowest point which is reasonably within the discretion afforded the trial court. *American Motorist Insurance Company v. American Rent-All, Inc.*, 579 So.2d 429 (La.1991); *Scott v. Hospital Service District No. 1 of the Parish of St. Charles*, 496 So.2d 270 (La.1986); *Carollo v. Wilson*, 353 So.2d 249 (La.1977); *Coco v. Winston Industries, Inc., supra.*

*Theriot v. Allstate Ins. Co.*, 625 So.2d 1337, 1340 (La.1993) (alteration in original).

The jury's general damage award consisted of:

| | |
|---|---|
| Emotional and mental anguish | $1,000,000.00 |
| Physical pain and suffering | $4,500,000.00 |
| Loss of enjoyment of life | $1,000,000.00 |

Scarring and disfigurement                    $1,000,000.00

The trial court did not err in failing to grant Defendant's motion for JNOV pertaining to damages. We find that the jury did not abuse its discretion in awarding Soileau $7,500,000.00 in general damages. Soileau's life has been dramatically impacted by the serious injuries that she suffered. She was physically active in both her career and recreational activities, none of which she can participate in now. She has severe disability and ongoing pain in her leg and foot. She cannot walk or stand for an extended period of time and requires a cane, crutches, or a wheelchair. She relies on her sister to provide basic needs that she formerly provided for herself, such as cooking and cleaning. The photographs clearly indicate a severely disfigured leg that will not improve over time. For these reasons, while this award may seem on the high side, we do not find that the jury abused its discretion. Defendants further argue that awards for scarring, emotional and mental anguish, physical pain and suffering, and loss of enjoyment of life are duplicative. However, Hartford did not object at trial to the itemization of damages on the jury verdict form, and we will not entertain its objection now. La.Code Civ.P. arts. 1793 and 1812.

### *Special Damages*

Special damages are those damages that may be determined with some degree of certainty and include past and future medical expenses and past and future lost wages. *Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70. The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence. *Cormier v. Colston*, 05-507 (La.App. 3 Cir. 12/30/05), 918 So.2d 541. The award of future medical expenses must be supported by medical testimony indicating both their need and probable cost. *Holliday v. United Servs. Auto. Ass'n*, 569 So.2d 143 (La.App. 1 Cir. 1990).

The jury's special damage award consisted of:

| | |
|---|---|
| Past medical expense | $458,758.81 |
| Future medical expenses | $750,000.00 |
| Past lost wages | $120,000.00 |
| Future lost wages | $601,000.00 |

Defendants argue there was no evidence to support a future medical award of $750,000.00. That Soileau will need future medical care for her injuries for life was uncontradicted at trial. Admittedly, though, there was no testimony pertaining to the future costs of such care. However, based on the past medical expense award of $458,758.81 and the consideration of Soileau's future life expectancy of twenty-eight more years, we do not find the jury abused its discretion in awarding Soileau $750,000.00 for future medical expenses. The $750,000.00 award for a period of thirty years amounts to $25,000 per year. Again, although on the high side, we cannot say that the jury abused its discretion.

Finally, we do not find that the jury's damage award was impermissibly tainted by the dismissal of the Smith's. The jury's damage awards are supported by the magnitude of Soileau's injuries. Assignments of error one through three are without merit.

## FAULT ALLOCATION

In the first part of this assignment of error, Soileau complains that the trial court erred in failing to instruct the jury on the burden of proving and apportioning fault under the Louisiana Product Liability Act. However, Soileau failed to object to the jury instructions although specifically given the opportunity to do so by the trial court. Thus, Soileau failed to preserve this issue for appeal. *See* La.Code Civ.P. art. 1793(C) and 1812.

Next, Soileau argues that the jury erroneously apportioned fault amongst the parties. Soileau argues that the lion's share of the fault should have been apportioned to Smith's because it allowed the tractor to be rented to Mamou despite the fact that the warning decal on the front-end loader that warned users that the front-end loader should not be operated without engaging the latch retainer, had worn away.[1] Soileau argues that this alteration was the superseding cause of this accident and that Smith's had the last clear chance to avoid the accident. Soileau further argues that Smith's should have been assessed no less than 51% percent of the fault up to 95% of the fault. Further, Soileau argues that Mamou could not have been found to be at fault because it could not heed a warning that had worn away; thus, it had no actual or constructive knowledge of the inherent dangers of the loader. Accordingly, Mamou should be assessed with 0% fault.

We recently reviewed the standard applicable to the factfinder's allocation of fault in *Thibodeaux v. Ace American Insurance Co.*, 13-577, pp. 6-8 (La.App. 3 Cir. 11/27/13), __ So.3d __, __:

> The Louisiana Supreme Court, in *Duncan v. Kansas City Southern Railway Co.*, 00-66, pp. 10-11 (La. 10/30/00), 773 So.2d 670, 680-681, stated that the standard of review applicable to comparative fault determinations is as follows:
>
>> This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded "the trier of fact is owed some deference in allocating fault" since the finding of percentages of fault is also a factual determination. *Clement v. Frey*, 95-1119 (La. 1/16/96); 666 So.2d 607, 609, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. *Id.*

---

[1] The bright orange warning label stated "DO NOT operate loader without engaging latch retainer. Failure to engage retainer could result in loader detaching from tractor causing serious bodily injury or death."

As such, it is clear that a fact finder's allocation of fault is subject to the manifestly erroneous or clearly wrong standard of review. *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993). The findings of fact made by a jury will not be disturbed unless they are manifestly erroneous or clearly wrong. *Id.* "Absent 'manifest error' or unless it is 'clearly wrong,' the jury or trial court's findings of fact may not be disturbed on appeal." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1111 (La.1990). "If the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been siting as the trier of fact, it would have weighed the evidence differently." *Id.* at 1112.

The factors to consider in an appellate review of an allocation of fault were addressed by the Louisiana Supreme Court in *Watson v. State Farm Fire & Casualty Insurance Co.*, 469 So.2d 967 (La.1985). Therein, the supreme court stated:

> [V]arious factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Id.* at 974.

These factors are also relevant to an appellate court's determination when ascertaining the highest or lowest percentage of fault that could reasonably be assessable to the respective parties. *Clement*, 666 So.2d 607. This court, in applying *Clement*, stated:

> [T]he allocation of fault is not an exact science, nor is it the search for a precise ratio. Rather, much like that of quantum assessment, allocation of fault is the finding of an acceptable range and any allocation by the trier of fact within that range cannot violate the manifest error standard of review. When we look to the applicable laws and standard of review, this court is to make a determination of whether any reasonable person could have made the allocation of fault that the jury made under the facts of this case.

10

*Layssard v. State, Dep't of Pub. Safety and Corrs.*, 07-78, p.4 (La.App. 3 Cir. 8/8/07), 963 So.2d 1053, 1058, *writ denied,* 07-1821 (La. 11/9/07), 967 So.2d 511.

The jury apportioned fault as follows:

(A)    Smith True Value            15%

(B)    Deere and Company           70%

(C)    Phyllis Soileau             0%

(D)    Town of Mamou               15%

(E)    Randy Toepfer               0%

The trial court instructed the jury that the fault of several parties had to be determined, assigning a percentage of fault to each party. The jury was informed that Deere had already been found to be partially at fault for the accident, but that it was the jury's prerogative to determine the percentage of fault that should be attributed to Deere. *See Soileau v. Smith's True Value and Rental*, 09-1066 (La.App. 3 Cir. 5/26/10), 40 So.3d 379.

Many witnesses testified on the issue of liability. Various Smith's employees testified about the rental procedure including Timothy Estes, Nicholas Miller, and Eric Jackson.

James Williams testified that he was employed by Mamou and rented the tractor the day of the accident. He said that no one at Smith's inspected it and that it was unloaded off of Smith's trailer and loaded directly onto Mamou's trailer. Williams said that he and other Mamou employees were using the tractor to clean the canal because it was stopped up. He said that they "cut the chain from the lower bar" and put it down the canal and started using the bucket to pick up trash. He said the tractor was slowly lowered into the canal by using a backhoe that was attached to the Deere tractor with a chain. Williams said that his coworker, Noel Sevallis, pushed the trash into a pile with the front-end loader and then used the

11

backhoe to scoop it out of the canal. Williams described easing the tractor out the canal and then unhooking the chain. He said that the front-end loader just popped off. He said that Soileau was standing about five or six feet away from the tractor. Williams stated that a safety meeting was conducted prior to use of the tractor reminding that no one should stand underneath the raised bucket. He said that everyone knew not to stand under the bucket regardless of whether there was a label indicating such.

Mitchell Fontenot testified that he worked for the street department in Mamou at the time of the accident. He stated that he had used Mamou's small tractors to clean out ditches before, but that this was the first time they used a front-end loader. He testified that the small, town-owned tractor "had burned up," and that is why they rented the Deere. He also described using a chain to hook the Deere tractor to the bucket of the backhoe in order to lower the tractor into the ditch. Fontenot stated that they had lowered the tractor into the ditch and taken it out about three times that day to clean out different areas. He said that in order to get the tractor out of the ditch, the bucket had to be lifted so that it would not hit a cement wall. Fontenot said that the tractor was located about twenty to thirty feet from the canal on level ground. He said that another employee, Johnny Logue, went to unhook the chain connecting the tractor and the backhoe, but that it was stuck. They tried to remove a pin that was stuck in the hook. Fontenot said that he used a hammer and a "punch" to accomplish this. He said that when the pin was removed the front-end loader fell forward and landed on top of Soileau.

Fontenot testified that they did not lower the bucket while they were trying to unhook the chain, and in hindsight, it would have been a good idea. He recalled having a safety meeting in which they were advised to be careful. He denied

12

reading any of the warning labels on the tractor. He said that as long as the hydraulic hoses were in place, the front-end loader should have never fallen.

Johnny Logue, a laborer for Mamou at the time of the accident, testified that they lowered the tractor into the canal for cleaning by chaining the rear of the Deere to the front bucket of the backhoe. He said they removed the Deere from the ditch by chaining the rear bucket of the backhoe to the bumper plate on the front-end loader. He described how the chain was "in a bind" when they tried to remove it and how they first attempted to unhook the chain by moving it around. He also confirmed that the front-end loader was lifted before removal from the ditch so that it would not get scraped on the sidewalk. He testified that Soileau's boss, Mr. Spencer, suggested they use a punch and a hammer. They removed the cotter pin from the retainer pin for the hook and punched the retainer out. He said that the entire front-end loader mechanism fell off at an angle and landed on Soileau.

Leonard Hammond, the supervisor of public works for the city of Opelousas, described using a similar method with a chain to lower the tractor to clean out canals.

Roger Allison, a backhoe operator for Mamou for fifteen years, testified to the procedure of lowering the tractor into the ditch with a chain connected to the backhoe. He described how the entire front-end loader mechanism fell off.

Sevallis was also working for Mamou the day of the incident. He similarly described lowering the tractor into the ditch and removing it. He described the struggle with the chain and how Logue had been positioned underneath the front-end loader trying to get the chain off. Sevallis said that once the pin became dislodged the entire bucket mechanism fell forward.

Mark Rougeau had rented tractors from Smith's since 1996. On October 5, 2007, he rented a tractor to work on some family plots. He said that after fifteen

13

minutes of using the front-end loader to push some chicken trees a hydraulic line broke. He called Smith's but they couldn't come until the next day, so Rougeau went and purchased a hydraulic hose and replaced it himself. He said the front-end loader would raise but not lower. He further testified that the right side of the front-end loader bucket later dropped. When asked if he was able to reattach the bucket to the front of the tractor, Rougeau stated: "Yes sir I was [sic]. I walked back to my truck, got my bottle jack and when I walked back I found the pin that apparently held the . . . the bucket together in the front and us . . . I used something. I can't remember what I used probably a nail or something to put in with the lost pin." Rougeau testified that when he returned the tractor he informed Smith's that the bucket had fallen off.

Keith Wyble, a carpenter, rented a tractor with a shredder from Smith's in October 2007. Wyble said that while he was shredding the shredder blade came off and fell to the ground. He called and reported it, and Smith's told Wyble that he could bolt the shredder back on.

Randall Topher, a welder fabricator for more than thirty-four years, testified that he does welding work for Smith's quite often; however he said that he did not do any welding on the tractor involved in this accident.

The jury heard testimony from and reviewed the reports of two expert engineers. Stephen Killingsworth, a mechanical engineer for more than thirty-three years, testified for the plaintiff. Jeremy Hoffpauir, a forensic engineer, testified for the defendants.

Killingsworth, a registered professional mechanical engineer for more than forty years and a retired Professor of Engineering at USL, was qualified as an expert in the areas of heavy equipment and has testified in approximately forty-five cases per year for thirty-five years. Killingsworth, who inspected the tractor

14

involved in this accident, discussed his written report of his findings that ultimately concluded that both Smith's and Deere bore some fault in causing this accident.

He testified that Deere "had a problem with the design from the beginning." He said that Deere had conducted some testing and the front-end loaders were falling off, so Deere added a latch-plate retainer. Deere realized that this was not working properly; thus, Deere provided a kit for units that were sold before the redesign. The kit relied upon a certain size pin to hold the latch plate retainer in place. If an end-user changed the size of the pin, the kit would not work correctly. Plus, various other end-user conditions, such as using a tow chain as the Mamou employees did here, could alter the functionality of the plate. Killingsworth testified:

> John Deere had problems with the design when it started and they made corrections and the corrections fixed many of the problems but didn't resolve the separation, totally resolve the separation of the latch plate from the unit. There were operating conditions that would happen. Was that operating condition in this particular case we haven't nailed an exact test on it but more probable not, yes. However, we've got other problems that John Deere couldn't overcome in a sense that by design and their maintenance.

Killingsworth said that Deere could have provided a towing mechanism such as hooks or instructions regarding the proper towing method; instead, it was up to the user to determine how to go about towing. Other things Deere could have done would be to provide two latch-plate retainers so that one would act as a back-up and provide chained pins on the latch-plate retainer as an extra safety measure to ensure that the proper pin was used. Killingsworth testified that Deere could have provided better warnings alerting the user that factory pins had to be used. Killingsworth said the tractor was a defective design even though sometimes it would operate properly.

Regarding Smith's fault, Killingsworth said that Smith's attempted to repair some wear to square tubing that supported the weight of the claws. However, he said that the welding was improperly done. Deere had provided a repair kit in the form of different sized shims along with instructions for their installation to address the wear of the claws and the square tubing. However, Killingsworth said that Smith's did not perform the repair in accordance with Deere's specifications. This resulted in improper loading on the claws which increased the likelihood of unwanted detachment. Killingsworth also opined that Smith's failed to provide proper instruction on using the tractor and front-end loader and failed to provide proper pins for the latch-plate retainer. Killingsworth rented the tractor from Smith's five months after the accident and testified that the wrong pin was in the unit. He also discussed some bent plates on the tractor, concluding that Smith's should not have rented the tractor out in that condition. He also noted that the factory warning label indicating that the front-end loader should not be used without engaging the latch retainer had worn off.

Hoffpauir testified that he inspected the tractor within a week of the accident. He said that it was missing the pin that holds the latch plate in place. Hoffpauir testified that the latch-plate retainer was bent. He also stated that the warning label had worn off over time. He reviewed several instances in which other people were injured when the bucket fell off, and various tests that were conducted by Deere in which the bucket fell off. In his report, which was submitted into evidence, Hoffpauir gave several conclusions including that Soileau would not have been injured if the loader bucket had been lowered to the ground before the employees starting working on it; Soileau would not have been injured if she was not standing beneath or within a few feet of the raised loader (decals warning against walking or working beneath a raised loader were locate on both sides); the operator's manual

16

did not give instruction relating to the method to be used to secure the tractor with the loader. Thus, Smith's method was reasonable, anticipated, and not prohibited by the manufacturer, and Smith's rental procedures did not contribute to the subject injury.

Hoffpauir testified that when the tractor was being pulled out of the ditch it caused the latch plate to go forward and come off causing the whole bucket assembly to rotate downwards. He said that the chain used by Mamou caused the latch plate to move forward. The force applied by the chain caused gouge marks consistent with the force that caused the latch plate retainer to come loose when the pin popped out. Hoffpauir said that the sloppy welding did not cause the accident. Hoffpauir opined that if the bucket had been lowered to the ground before the Mamou employees had started trying to remove the chain, the chain most likely would have come loose on its own because the load would have been taken off it and nothing would have fallen.

Hoffpauir said that it was his opinion "that working underneath that raised loader, especially a hammer trying to get things off is what caused this injury." However, he agreed that Deere should have put a warning label on the bucket indicating that the entire assembly could dislodge.

Eric Jackson, the rental and hardware manager at Smith's, testified that they kept Deere parts in stock and had a bin of replacement Deere pins ready for use. He testified that he had never seen a pin like the one Killingsworth testified to and that he would never approve a pin such as that one used in the latch-plate retainer. Jackson said that in his almost eleven years at Smith's he had never used any pin other than Deere ones. However, Jackson admitted that he was not there the afternoon that the tractor was rented to Mamou.

Having reviewed the evidence, we find that the jury did not manifestly err in its allocation of fault. Obviously, the jury found Killingsworth's testimony more persuasive. Reasonable people could have concluded that Deere bore the majority of fault for this accident because of its knowledge of the problems with the loader, the product recalls, and its failure to fix the problems. There was conflicting testimony about the nature of the pin holding the latch plate in place and its contribution to the accident. Further, although Smith's had allowed the warning decal to wear away, there was testimony that the Mamou employees likely would not have seen it anyway when the front-end loader was in the raised position. We find that the jury could have easily found that this accident would have occurred even if the warning label had been completely legible. Moreover, we do not agree that the missing label was the superseding cause of the accident. Reasonable people could find that the primary causes of this accident were the faulty construction of the latch-plate retainer and Deere's failure to provide other mechanisms and instructions for towing the tractor, an expected occurrence. Further, it was not error for the jury to conclude that Mamou bore a small percentage of the liability based on the testimony that it would have been wiser to lower the bucket before attempting to dislodge the chain. Accordingly, we cannot say that the jury manifestly erred in its assessment of fault. This assignment of error is without merit.

## CONCLUSION

The jury verdict in favor of Soileau awarding her $9,429,758.81 is affirmed. All costs of this appeal are assessed against Hartford Insurance Company.

**AFFIRMED**.

18