760 So.2d 302 (1999)
Cecilia Lloyd, Wife of and Ernest S. ANDERSON
v.
Herbert ICHINOSE, M.D. and St. Paul Fire & Marine Insurance Company.
No. 98-CC-2157.
Supreme Court of Louisiana.
September 8, 1999.
Leonard Arthur Radlauer, Radlauer & Bernstein, New Orleans, Counsel for Applicant.
Stewart Earl Niles, Jr., Jones, Walker, Waechter, Potevent, Carrere & Denegre, New Orleans, Kristin E. Hendricks, Margaret E. Bradley, Metairie, Counsel for Respondent.
James Burke Irwin, V, Quentin Fisk Urquhart, Jr., New Orleans, Counsel for Amicus Curiae Louisiana Association of Defense.
*303 Larry Michael Roedel, Cecil J. Blache, David Alva Woolridge, Jr., Baton Rouge, Counsel for Amicus Curiae American Insurance Company.
William E. Wright, Jr., Margaret Louise Sunkel, New Orleans, Counsel for Amicus Curiae Westport Insurance Group.
LEMMON, Justice.[*]
This medical malpractice action presents the issue of the validity of a provision in a liability insurance policy requiring, in order for policy coverage to apply, that (1) the professional services which were performed or should have been performed must occur after the retroactive date of the policy,[1] (2) the claim must first be made while the policy is in effect, and (3) the claim must be reported to the insurer or its agent while the policy is in effect. The particular question is whether the policy's denial of the applicability of coverage, when the professional service occurred within the policy period but the claim was not made or reported until after the policy period expired, violates public policy.

Facts
In October 1986, Dr. Herbert Ichinose, a pathologist, examined a biopsy of a mole on plaintiff's toe. He reported the mole was not cancerous, but nonetheless recommended removal of the mole because of its potential to develop into a cancerous condition. Plaintiff delayed removal until the mole became painful after trauma to the toe.
The mole was removed in December 1987, and was sent to Dr. Ichinose, who reported the mole was cancerous. Several weeks later, plaintiff had his toe amputated. Re-examination of the original October 1986 biopsy revealed Dr. Ichinose's misdiagnosis.
In November 1988, plaintiffs filed this action against Dr. Ichinose. In May 1995, plaintiffs amended their petition to add as a defendant Dr. Ichinose's medical malpractice insurer, St. Paul Fire & Marine Insurance Company. In response, St. Paul filed a motion for summary judgment, contending there was no coverage under the policy because although the alleged malpractice occurred after the retroactive date of the policy, the claim was not made or reported before the policy period expired on October 1, 1987. St. Paul viewed as irrelevant the fact that the policy expired before plaintiffs discovered the malpractice and filed suit and before Dr. Ichinose knew or should have known of the malpractice.
The trial court denied St. Paul's motion,[2] noting that "even if Dr. Ichinose did not give timely notice to St. Paul of a claim that he should have anticipated, nevertheless, there is a genuine issue of material fact as to whether or not he subjectively knew that there could have been a claim made resulting from his misdiagnosing the malignant tissue."
The court of appeal granted certiorari and rendered summary judgment in favor of St. Paul. The court, in an unpublished decision, distinguished Williams v. Lemaire, 94-1465 (La.App. 4th Cir. 5/16/95), 655 So.2d 765, a suit against an insurance agent's error and omissions carrier in which there was a genuine issue as to when the agent-insured became aware of the claim against it and whether that occurred during the policy period. Noting that the discussion in Williams was an action against an insurance agent's errors and omissions carrier in which there were genuine issues of fact as to when the agent *304 became aware of the claim against it and whether that occurred during the policy period, the court held there was no coverage under the undisputed facts in the instant case because the requirements for notification were not met.
On plaintiffs' application, we granted certiorari to address the correctness of the intermediate court's decision. 98-2157 (La.1/8/99), 734 So.2d 646.

St. Paul's Policy
St. Paul, who had insured Dr. Ichinose for his professional liability since 1975, issued the pertinent policy, entitled a "Physicians' Professional Liability Protection-Claims Made" policy, for a policy period of October 1, 1986 to October 1, 1987. The policy set forth the following coverage provisions:
When you are covered
To be covered the professional service must have been performed (or should have been performed) after your retroactive date that applies.[3]The claim must also first be made while this agreement is in effect.

When is a claim made?

A claim is made on the date you first report an incident or injury to us or our agent. You must include the following information:
 Date, time and place of the incident.
 What happened and what professional services you performed.
 Type of claim you anticipate.
 Name and address of injured party.
 Name and address of any witness. (emphasis added).
The policy also provided Dr. Ichinose with an option, in the event the policy was not renewed, to buy an extension of coverage beyond the policy period,[4] as follows:
Optional reporting endorsement
Your professional coverage may end because one of us chooses to cancel or not to renew it. If this happens, you have the right to buy an optional extension of coverage. It's called a reporting endorsement.
This endorsement will cover:
 Injuries or deaths that occur after the retroactive date and before the date this agreement ends. And
 Claims that are first made or reported to us after the ending date of this agreement and before the reporting endorsement ends.
You must request the reporting endorsement in writing within 30 days after this agreement ends. We'll then send it to you for a premium based on the rules and rating plans we're using on the day the reporting endorsement begins.
When the St. Paul policy period expired on October 1, 1987, Dr. Ichinose did not renew the policy, and he subsequently purchased a new professional liability policy with another insurer.
On December 2, 1987, after Dr. Ichinose had purchased other professional liability insurance, St. Paul wrote to Dr. Ichonose, offering him an extension until January 2, *305 1988 of is option to purchase the reporting endorsement. The letter expressly referred to the reporting endorsement and cautioned, "This is a claims-made form of coverage. This means that you will not have coverage for claims arising out of acts performed prior to the termination date for which a claim may be made after the termination date, unless you purchase Reporting Endorsement coverage." (emphasis in original).
Dr. Ichinose did not purchase the reporting endorsement coverage. Moreover, the policy he procured through another company had a retroactive date of November 11, 1987, a date that precluded coverage under the new policy of the act or omission that had occurred in October 1986. The circumstances of Dr. Ichinose's changing of insurers, his failure to buy extended coverage from St. Paul, and the setting of the retroactive date of the new policy resulted in a lack of coverage under the express terms of both claims-made policies. As to the St. Paul policy, the only one at issue in the proceedings, the misdiagnosis occurred at a time covered by the policy, but no claim was made and no claim was reported during that policy term.

Claims-made versus Occurrence Coverage
One of the seminal statements on the subject of distinguishing claims-made from occurrence policies was:
With the development of a more complex society, it became more reasonable, particularly with respect to the activities of professionals, to insure against the making of claims, rather than the happening of occurrences, and "claims made" insurance developed to meet a need for professionals to insure against the making of a claim as the insured event, rather than having to struggle with traditional concepts and difficulties inherent in determining whether the "event" insured against was the commission of an act, error or omission or the date of discovery thereof or the date of injury caused thereby.
The major distinction between the "occurrence" policy and the "claims made" policy constitutes the difference between the peril insured. In the "occurrence" policy, the peril insured is the "occurrence" itself. Once the "occurrence" takes place, coverage attaches even though the claim may not be made for some time thereafter. While in the "claims made" policy, it is the making of the claim which is the event and peril being insured and, subject to policy language, regardless of when the occurrence took place.
Sol Kroll, The Professional Liability Policy "Claims Made," 13 Forum 842, 843 (1978).
In Livingston Parish School Board v. Fireman's Fund American Ins. Co., 282 So.2d 478, 481 (La.1973), this court rejected a public policy attack on a claims-made policy. The insured in that case was an engineer who had procured coverage on a claims-made basis continually from the same insurer from July 11, 1966 until July 11, 1969. During that time, the engineer had provided professional services to construct a new building. Three days after the policy expired and the engineer had decided not to renew the policy, the roof of the building collapsed, and suit was filed against the engineer and others. In denying coverage of the claim against the engineer, the insurer relied on its policy requirement that not only must the negligent act occur during the policy period, but also a "claim therefor [must be] first made against the insured during the policy period."
The court, in analyzing the engineer's public policy argument, framed the issue as "whether the clause itself offends public policy as being manifestly unfair or oppressive, and as unreasonably restricting the coverage to claims for policy-covered negligence which are actually made within the year or within policy periods provided by successive and continuously renewed policies with [the same insurer]." Id. at 481. (emphasis in original). The court *306 concluded that no reasonable expectation of coverage by the insured was defeated by the unambiguous provisions clearly limiting coverage to those claims made during the policy period, stating "[i]n effect, the insured received what he paid for by the present policy, with premiums presumably reduced to reflect the limited coverage." Id. at 483. Thus, the court held that a claims-made policy that clearly limits coverage to acts discovered and reported during the policy period is not "per se impermissible."[5]Id. at 481.
In the twenty-six years since the Livingston Parish School Board case was decided, the trend nationwide has been generally to uphold claims-made policies. As a result, insurers have further refined such policies, and the use of that type of coverage in certain settings, especially those in which "long tail liability" is presented, has become commonplace. Harry W.R. Chamberlain II, Claims-Made Policies are Enforceable in California: Trends after Burns v. International Insurance Company, 28 Tort & Ins. L.J. 98 (1992).

Validity of the St. Paul Policy
The purpose of the claims-made-and-reported requirement[6] of the policy in the present case purportedly is "to alleviate problems in determining when a claim is made or whether an insured should have known a claim is going to be made." Warren Freedman, 2 Richard on the Law of Insurance § 11:7 (6th ed. 1990). A claimsmade policy works perfectly as long as the insured who is covered under the retroactive date requirement continues to purchase successive policies from the same insurer. Problems sometimes arise, however, when the insured changes insurers or when the insured, for whatever reason, does not renew the policy and does not obtain extended coverage, as occurred in the present case.
Unless there is a conflict with statutory provisions or public policy, insurers are entitled to limit their liability and to impose and enforce reasonable conditions upon the policy obligations they contractually assume. Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., 93-0911 at p. 6 (La. 1/14/94), 630 So.2d 759, 763; Livingston Parish School Board v. Fireman's Fund American Insurance Co., 282 So.2d 478, 481 (La.1973) (stating that "in the absence of conflict with statute or public policy, insurers may by unambiguous and clearly noticeable provisions limit their liability and impose such reasonable conditions as they wish upon the obligations they assume by contract").
Here, the insured changed insurers and did not purchase extended coverage from St. Paul. While the coverage of the insured is excluded by the unambiguous terms of the St. Paul policy, plaintiffs assert two bases for attacking the provisions on public policy grounds.
First, plaintiffs contend that La.Rev. Stat. 22:655, the Direct Action Statute, expresses the public policy that liability insurance is issued primarily for the protection of the public. Citing West v. Monroe Bakery, 217 La. 189, 46 So.2d 122 (1950), plaintiffs assert that the statute confers substantive rights on third party tort victims which are vested when the injury occurs.[7]
*307 The Direct Action Statute affords a victim the right to sue the insurer directly when the liability policy covers a certain risk. The statute does not, however, extend the protection of the liability policy to risks that were not covered by the policy or were excluded thereby (at least in the absence of some mandatory coverage provisions in other statutes).
The unambiguous terms of the policy in the present case limit coverage to professional services for which claims were made during the policy period. No claim was made against either the insured or the insurer during the policy period, and the insured has no right to coverage under the terms of the policy. Under these circumstances, the Direct Action Statute does not extend any greater right to third party tort victims who were damaged by the insured.[8]
Plaintiffs further contend that the insurance contract provisions are contrary to public policy under La.Rev.Stat. 40:1299.45 D(2), which prohibits cancellation of medical malpractice insurance policies insofar as the cancellation affects "any claim that arose against the insurer or its insured during the life of the policy." Plaintiffs argue that their claim for medical malpractice arose from professional acts or omissions that occurred during the policy period and therefore could not be adversely affected by cancellation of the policy.
Cancellation and expiration have entirely distinct meanings. As a general rule, expiration of a policy in accordance with its terms is not considered a cancellation of the policy. McKenzie & Johnson, supra at § 226. "Although the terms `cancellation' and `termination' are frequently used synonymously, they are two separate and distinct acts, each carrying significantly different legal requirements and consequences." Guidry v. Shelter Insurance Co., 535 So.2d 393 (La.App. 3d Cir. 1988). The term "cancellation" means "the termination of coverage under an insurance contract, with or without cause, by unilateral action of the insurer." Mezzacappo v. Travelers Ins. Co., 523 So.2d 291 (La.App. 3d Cir. 1988), cert. denied, 531 So.2d 473 (La.1988) (citing La.Rev.Stat. 22:636). The term "Termination" means "cessation of coverage under an insurance contract by reason of passage of the policy period or the occurrence of some event anticipated by the terms of the contract." Id. It follows then that "although insurance coverage terminates upon cancellation, termination of insurance coverage does not necessarily arise as a result of cancellation." Id.
Cancellation of the policy never occurred in the present case. The policy simply expired by its terms, and Dr. Ichinose chose not to extend the coverage Significantly, the event that triggered policy coverage did not occur during the policy period.
We conclude that application of the requirements of the claims-made policy under the facts of the present case does not violate public policy.

Decree
The judgment of the court of appeal is affirmed.
NOTES
[*] Knoll, J., not on panel. Rule IV, Part 2, § 3.
[1] The retroactive date requirement, which is explained later in the opinion, is not at issue in this case.
[2] After St. Paul was joined, Dr. Ichinose filed for bankruptcy protection. The bankruptcy court permitted St. Paul to proceed with its motion for summary judgment, but maintained the stay in effect as to any action that would result in a judgment against Dr. Ichinose individually.
[3] The retroactive date generally is the date (usually specified in the policy declarations) on or after which the wrongful act or omission must have occurred in order for claims arising therefrom to be covered. Retroactive dates are viewed as necessary protection against adverse selection, in that a prospective insured could otherwise wait until a claim is imminent before first buying claims-made coverage. Jean Lucey, Insuring and Managing the Professional Risk 34 n. 21 (1993).

The retroactive date specified in the policy for Dr. Ichinose was October 1, 1975, which was the date St. Paul began providing professional liability insurance to Dr. Ichinose.
[4] This optional coverage is also referred to as "tail coverage," which has been described as "`occurrence' coverage for occurrences within the policy period producing claims within the specified extended reporting period." Bob Works, Excusing Nonoccurrence of Insurance Policy Conditions in Order to Avoid Disproportionate Forfeiture: Claims-Made Formats as a Test Case, 5 Conn. L.J. 505, 528 n. 36 (1999).
[5] This restriction on the holding left open the issue of whether other claims-made policies with different provisions were permissible.
[6] While pure claims-made policies (aside from the retroactive date requirement) shift to the insured only the risk of claims incurred but not made, claims made and reported policies shift the risks both of claims incurred but not made and of claims made but not reported. Works, supra at 546.
[7] Several courts have divided on the issue of whether a third party tort victim, who is denied coverage under a claims-made policy because the timely notified insured failed to notify the insurer timely, may resort to the public policy provisions of the Direct Action Statute to obtain coverage, as has sometimes been permitted in similar situations under and occurrence policy. See Williams v. Lemaire, 94-1465 (La.App. 4th Cir. 5/16/95), 655 So.2d 765, cert. denied, 95-1514 (La. 9/22/95), 660 So.2d 481; Murray v. City of Bunkie, 96-297 (La.App. 3d Cir. 11/6/96), 686 So.2d 45, cert. denied, 97-0514 (La. 5/9/97), 693 So.2d 767; Reichert v. Bertucci, 94-1445 (La.App. 4th Cir. 1/31/95), 650 So.2d 821; Resolution Trust Corp. v. Ayo, 31 F.3d 285 (5th Cir. 1994). Because Dr. Ichinose was not notified of the claim and neither knew nor should have known of the claim during the policy period, we need not discuss whether notice to the insured satisfies the policy requirement of notice to the insurer in the absence of prejudice resulting from the delay in notice.
[8] As stated in n. 7, we leave for another day the question of whether a claims-made insurer may raise, in an action by a victim of the insured's tort, the defense of a non-prejudicial failure of the timely notified insured to give notice to the insurer during the policy period.