Judgment rendered January 15, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,096-CW
No. 53,099-CW
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

THE KANSAS CITY SOUTHERN          Plaintiff-Respondant
RAILWAY COMPANY AND
UNION PACIFIC RAILROAD
COMPANY

versus

THE WOOD ENERGY GROUP,          Defendant-Applicant
INC. AND CHARTIS SPECIALTY
INSURANCE COMPANY

* * * * *

On Application for Writs from the
Second Judicial District Court for the
Parish of Bienville, Louisiana
Trial Court No. 44216

Honorable Charles Glenn Fallin, Judge

* * * * *

DURRETT LAW OFFICES, LLC          Counsel for Appellant,
By: John Andrew Durrett              AIG Specialty Insurance
    Michael R. Smith                 Company, (formerly
                                       Known as Chartis
AKERMAN, LLP                    Specialty Insurance
By: Brent Connley Wyatt            Company)
    Matthew Schroeder
    Elliot Strader

PHELPS DUNBAR, LLC                   Counsel for Appellee,
By: Patrick A. Talley, Jr.           The Kansas City
    Jeremy Thomas Grabill            Southern Railway
                                     Company and Union
NEWELL & NEWELL                      Pacific Railroad
By: Daniel W. Newell                 Company

* * * * *

Before MOORE, STEPHENS, and McCALLUM, JJ.

**McCALLUM, J.**

In this environmental contamination case, Chartis Specialty Insurance Company, now known as AIG Specialty Insurance Company ("AIG"), and Kansas City Southern Railway Company and Union Pacific Railroad Company (collectively "the Railroads") have sought supervisory review with this Court following the trial court's denial of AIG's motion for summary judgment and the Railroads' motion for partial summary judgment. At issue in these motions was whether a primary insurance policy and an excess insurance policy issued by AIG to the Wood Energy Group, Inc. ("Wood"), provided coverage for losses allegedly exceeding $1 million that were incurred by the Railroads when remediating a site where Wood had processed railroad crossties under a contract with the Railroads.

Concluding that the subject policies did not provide coverage for the Railroads' losses, we affirm the trial court's denial of the Railroads' motion for partial summary judgment, but reverse the denial of AIG's motion for summary judgment.

## FACTS

In 2009, Wood entered into an agreement with Union Pacific Railroad Company ("Union Pacific") for the recycling of creosote-treated wooden rail crossties. Kansas City Southern Railway Company ("KCS") entered into a similar agreement with Wood the following year. Wood agreed to provide supervision, labor, equipment, materials, transportation, and permits to remove and dispose of the Railroads' used crossties. The resulting materials would be processed as fuel. Wood's operations were to take place on property ("site") owned by Louisiana & North West Railroad Company ("LNW") in Gibsland, Louisiana, that was leased by Wood.

Under the terms of the agreements with the Railroads, Wood agreed to procure and maintain commercial general liability insurance and pollution liability insurance during the life of the agreement.

AIG issued a primary policy with Wood as the named insured that afforded commercial general liability and pollution legal liability coverage. The policy period was from June 30, 2012, to June 30, 2013. AIG also issued a commercial excess policy with Wood as the named insured. The excess policy period was the same as for the primary policy. Coverage under the excess policy would be triggered by coverage under the underlying policy, which was the primary policy.

On February 6, 2012, the Environmental Protection Agency gave notice to LNW of an administrative order for violation of the Clean Water Act at the site. The alleged violations included the failure to obtain the necessary permit, the failure to install adequate storm water controls, and the discharge of a pollutant into the waters of the United States.

On July 10, 2012, the Louisiana Department of Environmental Quality ("LDEQ") gave Wood notice of a potential penalty regarding violations at the site. Wood was accused of: (1) processing regulated solid waste without a permit or authorization; (2) transporting regulated solid waste to an unauthorized, nonpermitted facility; (3) failing to obtain an air permit; and (4) failing to obtain a permit for water discharges.

In January of 2013, Wood filed for Chapter 11 bankruptcy. The next month, Wood converted its bankruptcy to a Chapter 7 bankruptcy. Wood left a literal mess for others to rectify.

On April 1, 2013, the LDEQ sent Wood a consolidated compliance order and notice of potential penalty. The LDEQ asserted that Wood had

lacked a permit or other authority to dispose of and/or process solid waste at the site. The LDEQ had conducted a site inspection there on February 19, 2013, and had found large volumes of accumulated creosote-treated crossties, which were considered solid waste, as well as several areas of stained soils and areas of pooled water with an oily sheen. The LDEQ noted that processing of solid waste at the site had stopped.

The LDEQ stated in the April 1 order and notice that it had found that Wood had violated regulations by depositing and processing regulated solid waste at the site without permit or authorization. Wood was ordered to remove all deposited regulated solid waste to an authorized facility, excavate areas of visibly contaminated soil, take any and all measures necessary to meet and maintain compliance with the solid waste regulations, and submit a written report detailing the actions to be taken to comply with the order.

On August 28, 2013, Commercial Insurance Associates wrote to AIG that it had been instructed by Maggie Smith, the trustee of Wood's bankruptcy estate, to forward notice of a claim to AIG. The letter further stated that it had received a "direct action" from LNW regarding pollution at the site as well as notice from the LDEQ regarding Wood's noncompliance with Louisiana's waste disposal regulations.

By letter to AIG dated August 28, 2013, LNW gave notice of a claim against Wood under the primary and excess policies. The letter further stated that LNW was providing notice to AIG for itself as an additional insured under the policies as well.

On May 28, 2014, the LDEQ sent demand letters to KCS and Union Pacific regarding site remediation. The LDEQ demanded the removal and proper disposal of solid wastes at the site, the design and implementation of

a remedial site investigation, and the design and implementation of any corrective actions necessary to address potential contamination of soil and/or groundwater at the facility. The letters informed the Railroads that soil and groundwater samples collected and tested by LNW revealed concentration of known hazardous substances in several soil samples that exceeded the LDEQ's standards for arsenic and various semivolatile organic compounds including benzo(a)anthracene, benzo(a)fluoranthene, and benzo(a)pyrene.

The Railroads, along with LNW, cooperated with the LDEQ's demands to clean up the site. On March 31, 2016, KCS, in its capacity as an additional insured and/or insured under the policies, made demand on AIG to defend and indemnify it in connection with the site remediation. KCS also stated it was making demand on AIG as Wood's insurer. KCS's letter listed Wood as the insured, KCS as an additional insured, and the LDEQ as a claimant.

On December 29, 2016, the Railroads filed this lawsuit against Wood and AIG. The Railroads alleged that Wood was liable to them for the costs of remediating the site, and they were entitled to recover from AIG for any liability of Wood. They also alleged that Wood and AIG were required to defend and indemnify them in connection with the LDEQ's demands because the Railroads were insureds and/or additional insureds under the primary and excess policies issued by AIG. Finally, the Railroads alleged that AIG had acted in bad faith by denying coverage.

KCS and Union Pacific prayed for a judgment: (i) finding Wood liable for environmental cost recovery, tort indemnity/contribution, and/or contractual liability/indemnity; (ii) finding AIG liable for Wood's damages; (iii) declaring and finding that KCS and Union Pacific are insureds and/or

4

additional insureds under the AIG policies; and (iv) awarding damages for AIG's bad faith failure to fulfill its defense and indemnity obligations.

In December of 2018, the LDEQ provided notice that it had reviewed a site investigation report and determined that no further action was necessary at the site.

In March of 2019, the Railroads filed a motion for partial summary judgment in which they argued they are entitled to summary judgment on the issue of coverage under the AIG policies for their losses in connection with responding to the LDEQ's demands. AIG filed its own motion for summary judgment asserting there was no coverage under its policies for the Railroads' losses.

Finding that genuine issues of material fact remained, the trial court denied the motions for summary judgment and partial summary judgment. AIG and the Railroads then applied for writs with this Court seeking supervisory review of the judgment. AIG and the Railroads agreed that there were no material facts in dispute, with the only issue being how the insurance policies applied to those undisputed facts. This Court consolidated the writs and granted them to docket.

## DISCUSSION

When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms. *Doerr v. Mobil Oil Corp.*, 00-0947 (La. 12/19/00), 774 So. 2d 119. The insurer bears the burden of proving the applicability of an exclusionary clause within a policy. *Id.*

Regarding the interpretation of insurance contracts, the Louisiana Supreme Court has stated:

An insurance policy is a contract between the parties and should be construed employing the general rules of interpretation of contracts set forth in the Louisiana Civil Code. The parties' intent, as reflected by the words of the policy, determine the extent of coverage. La.Civ.Code art. 2045[.] Words and phrases used in a policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. La.Civ.Code art. 2047.2. An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Where the language in the policy is clear, unambiguous, and expressive of the intent of the parties, the agreement must be enforced as written. However, if after applying the other rules of construction an ambiguity remains, the ambiguous provision is to be construed against the drafter and in favor of the insured.

The purpose of liability insurance is to afford the insured protection from damage claims. Policies therefore should be construed to effect, and not to deny, coverage. Thus, a provision which seeks to narrow the insurer's obligation is strictly construed against the insurer, and, if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied.

It is equally well settled, however, that subject to the above rules of interpretation, insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy.

*Reynolds v. Select Properties, Ltd.*, 93-1480 (La. 4/11/94), 634 So. 2d 1180, 1183 (case citations omitted). *See also Elliott v. Continental Cas. Co.*, 06-1505 (La. 02/22/07), 949 So. 2d 1247.

The fact that a policy provides general coverage, but then subjects it to certain exclusions, does not make the policy ambiguous. *McGee v. Allstate Ins. Co.*, 52,299 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1161, *writ denied*, 18-2057 (La. 2/18/19), 265 So. 3d 773.

The interpretation of an insurance policy ordinarily involves a legal question that can be properly resolved on motion for summary judgment. *Id.* Summary judgment declaring a lack of coverage under an insurance policy

6

may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded. *Reynolds*, *supra*; *Elliott*, *supra*.

Review of a grant or denial of a motion for summary judgment is *de novo*. *Lawrence v. Sanders*, 49,966 (La. App. 2 Cir. 6/24/15) 169 So. 3d 790, *writ denied*, 15-1450 (La. 10/23/15), 179 So. 3d 601.

Our review shows that the primary policy does not afford coverage for the losses sustained by the Railroads either as insureds for the demands made by the LDEQ or as claimants against Wood.

**Coverage D**

Coverage D is the pollution legal liability section of the primary policy. The Railroads argued in their motion for partial summary judgment that they are insureds under the policies and entitled to coverage for their losses under Coverage D as it provides coverage for "loss that the insured becomes legally obligated to pay as a result of claims for bodily injury or property damage resulting from pollution conditions on or under the insured property." Although the Railroads do not directly reference D-1.a. as the source of their coverage, the cited language is from that particular provision. D-1.a. states in its entirety:

> COVERAGE D – POLLUTION LEGAL LIABILITY
>
> 1. Insuring Agreements
>
> COVERAGE D-1
>
> a. THIRD-PARTY CLAIMS FOR ON-SITE BODILY INJURY OR PROPERTY DAMAGE
> We will pay **loss** that the insured becomes legally obligated to pay as a result of claims for **bodily injury** or **property damage** resulting from **pollution conditions** on or under the **insured**

7

**property** while the person injured or property damaged is on the **insured property** and such **pollution conditions** did not first commence before the Retroactive Date, if any, shown in the Schedule of Insured Property(ies) Endorsement, provided the **claim** for **bodily injury** or **property damage** is first made against the insured and reported to us in writing during the policy period or any **extended reporting period** if applicable.

The Railroads maintain that coverage is afforded under Coverage D because: (1) they are insureds under the policies; (2) the processing site is an insured property under the policies; (3) they incurred losses that they were legally obligated to pay as a result of the LDEQ's claims for property damage resulting from pollution conditions on or under the insured property; and (4) AIG received timely notice of the LDEQ's demands. The parties stipulated that the site is an insured property. AIG assumes for purposes of summary judgment that the Railroads are additional insureds under the policies.

Coverage D-1.a. states that the claim for property damage is to be made against the insured and reported to AIG in writing during the policy period or any extended reporting period. Thus, the AIG policy is a claims-made-and-reported policy insofar as coverage under D-1.a. is concerned.

Regarding the differences between claims-made insurance policies and occurrence insurance policies, our Supreme Court has cited what it considered a "seminal statement" on the subject:

> With the development of a more complex society, it became more reasonable, particularly with respect to the activities of professionals, to insure against the making of claims, rather than the happening of occurrences, and "claims made" insurance developed to meet a need for professionals to insure against the making of a claim as the insured event, rather than having to struggle with traditional concepts and difficulties inherent in determining whether the "event" insured against was the commission of an act, error or omission or the date of discovery thereof or the date of injury caused thereby.

8

> The major distinction between the "occurrence" policy and the "claims made" policy constitutes the difference between the peril insured. In the "occurrence" policy, the peril insured is the "occurrence" itself. Once the "occurrence" takes place, coverage attaches even though the claim may not be made for some time thereafter. While in the "claims made" policy, it is the making of the claim which is the event and peril being insured and, subject to policy language, regardless of when the occurrence took place.

*Anderson v. Ichinose*, 98-2157, pp. 5-6 (La. 9/8/99), 760 So. 2d 302, 305 (quoting Sol Kroll, *The Professional Liability Policy "Claims Made"*, 13 Forum 842, 843 (1978)).

There are even differences between claims-made policies and claims-made-and-reported policies. Pure claims-made policies shift to the insured only the risk of claims incurred but not made. *Anderson v. Ichinose*, *supra* (citing Bob Works, *Excusing Nonoccurrence of Insurance Policy Conditions in Order to Avoid Disproportionate Forfeiture: Claims-Made Formats as a Test Case*, 5 Conn. L.J. 505, 546 (1999)). Under a claims-made-and-reported policy, the risk of a claim incurred but not made, as well as a claim made but not reported, is shifted to the insured. *Gorman v. City of Opelousas*, 13-1734 (La. 7/1/14), 148 So. 3d 888. *See Anderson v. Ichinose*, *supra*. The event and peril insured against is based on making and reporting of the claim within the period specified by the policy. *Gorman*, *supra*.

As discussed in *Gorman*:

> "The purpose of the reporting requirement [in a claims-made policy] is to define the scope of coverage [purchased by the insured] by providing a certain date after which an insurer knows it is no longer liable under the policy." Once the policy period and reporting period expire, the insurer can "close its books" on that policy.

*Id.*, 13-1734 at pp. 6-7, 148 So. 3d at 893 (citations omitted).

9

In *Gorman*, *supra*, the Supreme Court concluded that provisions on the making and reporting of claims in a claims-made-and-reported policy were a permissible limitation on the insurer's liability as to third parties.[1] The Court reasoned that not enforcing the provisions would effectively convert the claims-made-and-reported policy into an occurrence policy, resulting in the judicial modification of the bargained-for exchange between the insurer and insured. *Id. See Hood v. Cotter*, 08-0215 (La. 12/2/08), 5 So. 3d 819.

AIG correctly argues in opposition to the Railroads' motion for partial summary judgment that the Railroads did not comply with the claims-made-and-reported provisions. The policy period ended on June 20, 2013. There was an extended reporting period of 60 days following the end of the policy period. The LDEQ did not make claims against the Railroads until May 28, 2014. KCS did not report the claim to AIG or make a claim against Wood until March 31, 2016, at the earliest. The Railroads sued AIG in December of 2016. Thus, the LDEQ's claims against the Railroads and the Railroads' claims against Wood were made well outside the policy period and extended reporting period.

Nevertheless, the Railroads maintain that the claims-made-and-reported provisions were complied with during the policy period and extended reporting period. The Railroads note that the LDEQ made claims against Wood on July 10, 2012 (notice of potential penalty) and on April 1, 2013 (consolidated compliance order and notice of potential penalty). The

---

[1]As noted in *Gorman*, in *Livingston Parish Sch. Bd. v. Fireman's Fund Am. Ins. Co.*, 282 So. 2d 478 (La. 1973), the Louisiana Supreme Court rejected a public policy attack made on a claims-made-and-reported policy in connection with an insured's claim.

Railroads further note that these claims were reported to AIG during the extended reporting period because on August 28, 2013, AIG received notice of the LDEQ's demands from the bankruptcy trustee and from LNW. However, those events do not constitute compliance by the Railroads with the claims-made-and-reported provisions. Allowing those events to do so would broaden the bargained-for coverage and convert the policy to an occurrence policy.

Moreover, in Section IV-CONDITIONS of the policy, there is a provision regarding the separation of insureds:

> 6. Separation of Insureds
> Except with respect to the Limits of Insurance, and any rights or duties specifically assigned to the first Named Insured, this insurance applies:
> a.) As if each Named Insured were the only Named Insured; and
> b.) Separately to each insured against whom claim is made or suit is brought.
> Solely with respect to Coverage D, this condition shall not apply to an insured that is a parent, subsidiary or affiliate of you.

Under this provision, the Railroads as additional insureds are treated separately from the other insureds under the policy. The Railroads were independently required to satisfy the claims-made-and-reported requirement. Thus, claims made timely against Wood and/or LNW and timely reported to AIG do not inure to the benefit of the Railroads.

The Railroads point out that during discovery, AIG produced an internal email in which an AIG claims handler admitted there was D-1 coverage in reference to an insurance claim made by LNW. Even if the email is taken literally, this April 16, 2014, email cannot be construed as meaning that coverage for LNW's claims equates to coverage for the Railroads' claims, especially in light of the separation of insureds provision.

11

In summary, the primary policy does not provide coverage under Coverage D to either the LDEQ's claims against the Railroads as the insured or the Railroads' claims against Wood as the insured.

**Coverage A**

In their motion for partial summary judgment, the Railroads maintained that while they are entitled to coverage under Coverage A, they did not seek summary judgment on that basis because they believed they are entitled to coverage under Coverage D. Thus, their motion focused exclusively on Coverage D. AIG argued in its motion for summary judgment that the primary policy did not afford coverage for the Railroads' losses under either Coverage A or Coverage D. The Railroads counter that AIG did not meet its burden under its motion of proving the lack of coverage under Coverage A.

Coverage A, which provides coverage for bodily injury and property damage liability, states, in relevant part:

> **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **1. Insuring Agreement**
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies. We will have the right and duty to defend the insured against any suit seeking those damages. However we will have no duty to defend the insured against any suit seeking damages for **bodily injury** or **property damage** to which the insurance does not apply. . . .

AIG argues that there is no coverage afforded under Coverage A because of a pair of relevant exclusions. The first is the property damage exclusion:

> **2. Exclusions**

12

This insurance does not apply to:

. . . . .

j. **Damage to Property**

**Property damage** to:

(1) Property you own, rent, or occupy including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

. . . . .

This exclusion expressly excludes coverage under Coverage A for property damage to property rented or occupied by Wood. Coverage A states that AIG will pay sums that the "insured becomes legally obligated to pay as damages because of the . . . property damage." However, excluded is property damage to property "you . . . rent, or occupy[.]" The policy defines "you" as the named insured, meaning Wood, which leased the site from LNW.

Additionally, the exclusion states that the excluded property damage includes "any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason[.]" Again, "you" is the named insured, Wood. Thus, the cleanup costs incurred by the Railroads in restoring the property were "costs incurred . . . by any other . . . entity[.]"

AIG next contends that coverage is not afforded under Coverage A because of the pollution exclusion. This exclusion states:

**2. Exclusions**

This insurance does not apply to:

13

. . . . .

f. **Pollution**

(1) **Bodily injury** or **property damage** which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants** at any time.

(2) Any loss, cost, or expense arising out of any:
(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**; or
(b) **Claim** or **suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

. . . . .

Regarding pollution, the primary policy contains some relevant

definitions:

31. **Pollutants** mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed. Pollutants shall include **Microbial Matter** and legionella pneumophilia.

32. **Pollution conditions** means the discharge, dispersal, release or escape of **pollutants** into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater, provided such conditions are not naturally present in the environment in the amounts or concentrations discovered.

Under the pollution exclusion, the primary policy does not apply to

property damage which would not have occurred but for the "discharge,

dispersal, seepage, migration, release, or escape of pollutants at any time."

The LDEQ found accumulated crossties on the site. Those crossties were

characterized as regulated waste. Waste is included within the definition of

"pollutants." Samples taken of the soil there also revealed the presence of

arsenic and various semivolatile organic compounds. Undoubtedly the

14

property damage originated from the "discharge, dispersal, seepage, migration, release, or escape of pollutants[.]"

These two exclusions under Coverage A are entirely unambiguous and apply to the claims brought by the LDEQ against the Railroads as insureds and to the claims brought by the Railroads against Wood as an insured.

The Railroads argue that the damage to property exclusion does not apply because contamination to groundwater would not have been damage to property rented or occupied by Wood. They additionally argue that AIG has not cited evidence of what property was actually remediated. In regards to the pollution exclusion, the Railroads argue that the exclusion would not apply to the mere presence of pollutants. They maintain that AIG has not established there was a "discharge, dispersal, seepage, migration, release or escape of pollutants" requiring site remediation within the scope of the pollution exclusion. The Railroads' arguments are inconsistent.

If the property damage exclusion is inapplicable because of groundwater contamination, then that contamination would have necessarily come from the discharge, dispersal, seepage, migration, release, or escape of pollutants from Wood's activities at the site. Moreover, in order to have coverage under Coverage D-1.a. as alleged by the Railroads, there would need to be "property damage resulting from pollution conditions[.]" As defined in the policy, "pollution conditions" means "the discharge, dispersal, release or escape of pollutants[.]" Furthermore, the Railroads also argue that AIG has not cited evidence of what property was actually remediated, yet the Railroads are seeking coverage for losses they incurred in remediating the site.

15

Finally, the pollution exclusion states the policy does not apply to any loss, cost, or expense arising from any "[r]equest, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants[.]" That is the essence of what the LDEQ demanded the Railroads do and how they incurred their losses in this matter.

**CONCLUSION**

In summary, regardless of whether Wood or the Railroads are considered the insured, the primary policy did not afford coverage for the costs incurred by the Railroads in connection with remediating the site as demanded by the LDEQ. Since there is no coverage under the primary policy, there is no coverage under the excess policy and the Railroads' bad faith claim fails as well. Accordingly, the trial court erred in denying AIG's motion for summary judgment.

At the Railroads' cost, we **AFFIRM** that part of the judgment denying the Railroads' motion for partial summary judgment, but **REVERSE** that part of the judgment denying AIG's motion for summary judgment.